In the Matter of SAMUELS & CO., INC., Bankrupt.

Curtis R. STOWERS et al., Appellants,

v.

James S. MAHON, Trustee, and C.I.T. Corporation, Appellees.

No. 73–1185.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 1976.
Rehearing Denied April 1, 1976.

Lamar Holley, Dallas, Tex., for appellants.

J. Richard Gowan, Dallas, Tex., for appellees.

John A. Grambling, Dean Hester, El Paso, Tex., amicus curiae.

Before BROWN,* Chief Judge, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, INGRAHAM, RONEY and GEE, Circuit Judges.

PER CURIAM:

The action of the panel[1] is reversed and the judgment of the District Court is affirmed.

█ The court en banc adopts as its opinion the dissenting opinion of Judge Godbold[2] with the additional comments which we set out in the margin.[3]

* Chief Judge Brown did not participate in the decision of this case.

1. 510 F.2d 139 (C.A.5, 1975).

2. 510 F.2d 139, 154–160 [attached hereto as an appendix].

3. In remanding the case to this court the Supreme Court left open for our determination the question of whether "a course of conduct mandated by the Act or regulations might not, just as any other course of conduct, be relevant or even dispositive under state law." *Mahon v. Stowers,* 416 U.S. 100, 113–114, 94 S.Ct. 1626, 1633, 40 L.Ed.2d 79, 89 (1974). The evidence of course of dealings, see Texas Business and Commercial Code, § 1.205(a), shows that the plaintiffs and Samuels had a history of dealing in the manner mandated by the Act and the regulations. That course of

The judgment of the District Court is affirmed.

## APPENDIX
### Opinion of Circuit Judge GODBOLD
### (510 F.2d at 154)

I dissent.

█ This case raises one primary question: under the Uniform Commercial Code as adopted in Texas, is the interest of an unpaid cash seller in goods already delivered to a buyer superior or subordinate to the interest of a holder of a perfected security interest in those same goods? In my opinion, under Article Nine,[1] the perfected security interest is unquestionably superior to the interest of the seller. Moreover, the perfected lender is protected from the seller's claims by two independent and theoretically distinct Article Two provisions. My result is not the product of revealed truth, but rather of a meticulous and dispassionate reading of Articles Two and Nine and an understanding that the Code is an integrated statute whose Articles and Sections overlap and flow into one another in an effort to encourage specific types of commercial behavior. The Code's overall plan, which typically favors good faith purchasers,[2] and which encourages notice filing of nonpossessory security interests in personalty through the imposition of stringent penalties for

dealing is the basis for the view, shared by the majority members and the dissenting member of the panel, that the sales of livestock to Samuels by plaintiffs were cash sales.

Also we note a matter not mentioned in the dissenting opinion of Judge Godbold. The District Court, which accepted the Referee's findings of fact but rejected his conclusions of law, held that C.I.T. and the trustee in Bankruptcy were good faith purchasers for value, and the Supreme Court in its opinion referred to them as such. 416 U.S. at 104, 94 S.Ct. at 1628, 40 L.Ed.2d at 84.

1. Ch. 9, Tex.Bus. & C.Code. All citations and references to the U.C.C. are to the Code as adopted in Texas.

2. See, e. g., §§ 2.403; 3.302, 3.305; 6.110; 7.501, 7.502; 8.301, 8.302; 9.307; 9.309.

**1242**

nonfiling, compels a finding that the perfected secured party here should prevail.

My brothers have not concealed that their orientation in the case before us is to somehow reach a result in favor of the sellers of cattle, assumed by them to be "little fellows," and against a large corporate lender, because it seems the "fair" thing to do. We do not sit as federal chancellors confecting ways to escape the state law of commercial transactions when that law produces a result not to our tastes. Doing what seems fair is heady stuff. But the next seller may be a tremendous corporate conglomerate engaged in the cattle feeding business, and the next lender a small town Texas bank. Today's heady draught may give the majority a euphoric feeling, but it can produce tomorrow's hangover.

## I. Rights under § 2.403

My analysis begins with an examination of the relative rights of seller and secured party under § 2.403(a).

■ Section 2.403 gives certain transferors power to pass greater title than they can themselves claim. Section 2.403(a) gives good faith purchasers of even fraudulent buyers-transferors greater rights than the defrauded seller can assert. This harsh rule is designed to promote the greatest range of freedom possible to commercial vendors and purchasers.

The provision anticipates a situation where (1) a cash seller has delivered goods to a buyer who has paid by a check which is subsequently dishonored, § 2.403(a)(2), (3), and where (2) the defaulting buyer transfers title to a Code-defined "good faith purchaser." The interest of the good faith purchaser is protected *pro tanto* against the claims of the aggrieved seller. §§ 2.403(a); 2.403, Comment 1. The Code expressly recognizes the power of the defaulting buyer to transfer good title to such a purchaser even though the transfer is wrongful as against the seller. The buyer is granted the *power* to transfer good title despite the fact that under § 2.507 he lacks the *right* to do so.

The Code definition of "purchaser" is broad, and includes not only one taking by sale but also covers persons taking by gift or by voluntary mortgage, pledge or lien. § 1.201(32), (33). It is therefore broad enough to include an Article Nine secured party. §§ 1.201(37); 9.101, Comment; 9.102(a), (b). Thus, if C.I.T. holds a valid Article Nine security interest, it is by virtue of that status *also* a purchaser under § 2.403(a). *See First Citizens Bank and Trust Co. v. Academic Archives, Inc.,* 10 N.C.App. 619, 179 S.E.2d 850 (1971); *Stumbo v. Paul B. Hult Lumber Co.,* 251 Or. 20, 444 P.2d 564 (1968); *In re Hayward Woolen Co.,* 3 U.C.C. Rep. 1107 (D.Mass., 1967).

While I shall discuss in detail *infra,* the implications of C.I.T.'s security interest under Article Nine and under other Article Two provisions, I here note that C.I.T. is the holder of a perfected Article Nine interest which extends to the goods claimed by the seller Stowers.

Attachment of an Article Nine interest takes place when (1) there is agreement that the interest attach to the collateral; (2) the secured party has given value; and (3) the debtor has rights in the collateral sufficient to permit attachment. § 9.204(a).

(1) *The agreement*: In 1963, Samuels initially authorized C.I.T.'s lien in its after-acquired inventory. The agreement between these parties remained in effect throughout the period of delivery of Stowers' cattle to Samuels.

■ (2) *Value*: At the time of Stowers' delivery, Samuels' indebtedness to C.I.T. exceeded $1.8 million. This preexisting indebtedness to the lender constituted "value" under the Code. § 1.201(44).

■ (3) *Rights in the collateral*: Finally, upon delivery, Samuels acquired rights in the cattle sufficient to allow attachment of C.I.T.'s lien. The fact that the holder of a voluntary lien—in-

APPENDIX—Continued

cluding an Article Nine interest—is a "purchaser" under the Code is of great significance to a proper understanding and resolution of this case under Article Two and Article Nine. The Code establishes that purchasers can take from a defaulting cash buyer, § 2.403(a). Lien creditors are included in the definition of purchasers, § 1.201(32), (33). A lien *is* an Article Nine interest, §§ 9.101, Comment; 9.102(b); 9.102, Comment. The existence of an Article Nine interest presupposes the debtor's having rights in the collateral sufficient to permit attachment, § 9.204(a). Therefore, since a defaulting cash buyer has the power to transfer a security interest to a lien creditor, including an Article Nine secured party, the buyer's rights in the property, however marginal, must be sufficient to allow attachment of a lien. And this is true even if, *arguendo,* I were to agree that the cash seller is granted reclamation rights under Article Two. *See First National Bank of Elkhart Cty. v. Smoker,* 11 U.C.C.Rept.Serv. 10, 19 (Ind.Ct.App., 1972); *Evans Products Co. v. Jorgensen,* 245 Or. 362, 421 P.2d 978 (1966).

[redacted] If the Article Nine secured party acted in good faith, it is prior under § 2.403(a) to an aggrieved seller. Under the facts before us, I think that C.I.T. acted in good faith. The Code good faith provision requires "honesty in fact", § 1.201(19), which, for Article Two purposes, is "expressly defined as . . reasonable commercial standards of fair dealing." §§ 1.201, Comment 19; 2.103(a)(2). There is no evidence that C.I.T. acted in bad faith in its dealings with Samuels, or that Stowers' loss resulted from any breach of obligation by C.I.T. There is no claim that the 1963 security agreement was the product of bad faith. The lender's interest had been perfected and was of record for six years when Stowers' delivery to Samuels occurred. There is no suggestion that the $1.8 million debt owing from Samuels to C.I.T. was the result of bad faith or of a desire to defeat Stowers' $50,000 claim. There is no claim that C.I.T. exercised or was able to exercise control over Samuels' business operations. There is no evidence that C.I.T. authorized or ordered or suggested that Samuels dishonor Stowers' check. There is no contention that C.I.T.'s refusal to extend credit on May 23, the date Samuels filed a voluntary petition on bankruptcy at a time when it owed C.I.T. more than $1.8 million, was violative of an obligatory future advance clause. The Code's good faith provision requires "honesty in fact", § 1.201(19); it hardly requires a secured party to continue financing a doomed business enterprise.

The majority deny that C.I.T. acted in good faith because, they claim, the lender had "intimate" knowledge of Samuels' business operations. The majority's source of information on the scope of C.I.T.'s knowledge is a little puzzling. The Referee in Bankruptcy found only that "C.I.T. knew or should have known of the manner by which the bankrupt bought livestock . . . on a grade and yield basis." *In the Matter of Samuels & Co., Inc.,* No. BK 3–1314 (N.D. Tex., order of Jan. 19, 1972). This factual finding was affirmed by the District Court which reversed the Referee and upheld C.I.T.'s propriety over Stowers. *Id.,* orders of Nov. 24, 1972, and Jan. 16, 1973. Neither the Referee nor the District Court found, nor have the parties alleged, that C.I.T.'s knowledge of Samuels' business extended to knowledge of the debtor's obligations to third party creditors.

[redacted] However, even if evidence had established that C.I.T. knew of Samuels' nonpayment and of Stowers' claim, C.I. T.'s status as an Article Two good faith purchaser would be unaffected. Lack of knowledge of outstanding claims is necessary to the common law BFP, and is similarly expressly required in many Code BFP and priority provisions. *See e. g.,* §§ 3.302; 6.110; 8.301, 8.302; 9.301(a)(2). But the Code's definition of an Article Two good faith purchaser

APPENDIX—Continued

does not expressly or impliedly include lack of knowledge of third-party claims as an element. The detailed definition of the Article's counterpart of the common law BFP requires only honesty in fact, reasonable commercial behavior, fair dealing. And this describes precisely C.I.T.'s dealings with Samuels: during the period May 13–22—the time when the bulk of Stowers' cattle were delivered and the time of the issuance of the NSF checks—C.I.T.'s advances to Samuels totalled $1 million. The advances were curtailed on May 23 because of Samuels' taking voluntary bankruptcy at a time when its indebtedness to C.I.T. was enormous. The decision to terminate further funding was clearly reasonable. It was also fair, and honest, and, as the majority have failed to grasp, was not the cause of Stowers' suffering. As I note infra in my analysis of rights under Article Nine, the sellers' loss was avoidable through perfection of their security interests in the cattle. If they had perfected, they would not only have been prior to C.I.T. as an Article Nine lender, § 9.312, but also protected against C.I.T. as an Article Two purchaser, § 9.201. As it happens, Stowers did not perfect. I believe the sellers cannot now be permitted to force an innocent, if prosperous, secured creditor to shoulder their loss for them.

## II. Rights under § 2.507

The majority opinion devotes much of its concentration and energy to an analysis of the sellers' "reclamation right" under § 2.507 and § 2.702. Relying on an expansive reading of these Sections, the opinion concludes that a cash seller whose right to payment is frustrated through a check ultimately dishonored can "reclaim" proceeds of goods delivered to the buyer despite an interim third-party interest, and despite a year-long delay in seeking reclamation. I am unable to accept this reading of Code policy and requirements.

Although the Code expressly grants a credit seller the right and power to reclaim goods from a breaching buyer, the right is triggered only by specific and limited circumstances; it can be asserted only if an exacting procedure is followed; and the right can never be asserted to defeat the interests of certain third parties who have dealt with the defaulting buyer. § 2.702(b), (c). There is no Code Section expressly granting a similar reclamation right to a cash seller.

The seller's remedies upon breach are enumerated in § 2.703. These provisions do not include or suggest a right or power in a cash seller to recover goods already delivered to a breaching buyer. Nevertheless the courts have read a reclamation right into the Code. It is this judicially-confected right to reclaim goods in which the majority's reclamation analysis is grounded. However, the majority take the reclamation right beyond anything intimated by the Code or heretofore permitted by courts recognizing a cash seller's reclamation right.

The cash seller's right to reclaim has been drawn from the language of § 2.507(b) and § 2.507, Comment 3. I note, first, that the remedy granted by § 2.507(b) is one of seller against buyer, see In re Helms Veneer Corp., 287 F.Supp. 840 (W.D.Va., 1968). It does not concern rights of seller against third parties. Section 2.507, Comment 3 explains that the seller's rights under § 2.507 must "conform with the policy set forth in the bona fide purchase section of this Article," i. e., with § 2.403. As I have noted above, under this provision the rights of an aggrieved cash seller are subordinated to those of the buyer's good-faith purchasers, including Article Nine lenders such as C.I.T. Thus, the Code provisions supporting a cash seller's reclamation right expressly preclude recovery by Stowers as against C.I.T. See §§ 2.507(b); 2.507, Comment 3; 2.702(b), (c). See also Stumbo v. Paul B. Hult Lumber Co., 251 Or. 20, 444 P.2d 564 (1968); In re Hayward Woolen Co., 3 U.C.C.Rep. 1107 (D.Mass., 1967); Evans

APPENDIX—Continued

*Products Co. v. Jorgensen,* 245 Or. 362, 421 P.2d 978 (1966).

Moreover, those courts which have permitted reclamation under § 2.507 have invariably adhered to § 2.507, Comment 3's express requirement that demand for return be made within ten days after receipt by the buyer or else be lost. *See In re Colacci's of America, Inc.,* 490 F.2d 1118 (C.A.10, 1974); *In re Helms Veneer Corp., supra; Stumbo v. Paul B. Hult Lumber Co., supra; In re Mort,* 208 F.Supp. 309 (E.D.Pa., 1962).

In the instant case, demand was not made within ten days or ten weeks; it came a full year after delivery to Samuels. The majority excuse this gross noncompliance by finding that the sellers' failure was the product of innocent error, and, in any event, was not required since the "purpose" of the demand rule—protection of purchasers of the delivered goods—was served through C.I.T.'s alleged intimate knowledge of Samuels' business operations.

■ The Code's ten-day provision is an absolute requirement. There is no exception in the Code Sections or Comments, express or implied, to the statutory period. I would be hesitant to read any extension into a statute of limitations clear and unambiguous on its face, and particularly unwilling to allow an extension some 36 times greater than the statutory maximum. My reluctance is all the greater where the right at issue is not granted by the Code but is rather the product of judicial interpretation of a Comment which, whatever grant of power it may suggest, expressly limits that right to a ten-day life.

■ The spirit in which the rule was broken seems to me irrelevant. Even conceding that Stowers' noncompliance occurred in absolute good faith, it was nonetheless noncompliance. Mistake of law does not constitute excuse of mistake.

■ C.I.T.'s apocryphal intimate knowledge of Samuels' business operations is, I believe, also irrelevant to a determination of the validity of Stowers' claim. The majority find the purpose of the ten-day rule to be one of notice to third parties that a claim exists. I have somewhat greater difficulty than my brothers in pinpointing the purpose of the ten-day rule. But I am convinced that the goal is not one of protection or notice to third-party purchasers, for their rights are secure under the Code as against the aggrieved seller even if demand is timely made. §§ 2.507, Comment 3; 2.702(c). The Code does not condition the purchasers' rights on a lack of knowledge of the seller's interest. With or without knowledge, the purchaser rests secure. I am therefore forced to conclude that the ten-day rule serves some function other than notifying third-party takers, and, consequently, that even if C.I.T. knew of Stowers' claim, the sellers' obligation under the ten-day rule would not have been excused. And even if knowledge by the purchaser suspended the sellers' duty to make a timely demand, the record in this case is devoid of any hint that C.I.T. knew of Samuels' breach and Stowers' reclamation right.

■ Moreover, § 2.507 and § 2.702 speak of a right to reclaim goods. Neither provision grants a right to go after proceeds of those goods. Where a right or interest in proceeds is recognized by the Code it is recognized expressly. *See e. g.,* § 9.306. The right granted by § 2.507 is narrowly defined. I am unwilling to imply an extension to such a short-lived and precisely drawn remedy.

■ Finally, even if there were a right to reclaim proceeds, even if the right had been timely exercised, and even if it could have been exercised despite the transfer of interest to C.I.T., Stowers would have taken subject to C.I.T.'s perfected Article Nine interest. See §§ 9.201, 9.301, 9.306, 9.312. *See also* my discussion of C.I.T.'s rights and interest under Article Nine, *infra.*

APPENDIX—Continued

### III. Rights under § 2.511

The majority opinion states that C.I.
T.'s interest cannot be found superior to
Stowers' because such a finding would
violate § 2.511's prohibition on penalizing
a seller for accepting as payment a check
which is ultimately dishonored. I believe
the majority have misconstrued the
scope and significance of § 2.511.

▇▇ Like § 2.507, § 2.511 concerns
claims of the seller as against the buyer.
See § 2.511(c), § 2.511, Comment 4. On
its face it does not affect the rights of
third parties taking from the defaulting
buyer. Moreover, and more important,
the seller is not here "penalized" for tak-
ing an N.S.F. check. Such loss as Stow-
ers suffered is the direct result of his
failure to comply with Code provisions
which, once followed—and regardless of
Stowers' acceptance of Samuels' check—
would have made his interest invulnera-
ble to claims by C.I.T. *See, e. g.,*
§§ 9.107; 9.201; 9.301; 9.312(c), (d).

### IV. Rights under Article Nine

I am also unable to agree with the
majority's conclusion that, under the
Code, Stowers' interest is different from
and greater than a security interest.
Similarly, I disagree with the theory
that by virtue of Stowers' power under
Article Two, C.I.T.'s security interest is
subject to defeat since it (1) could not
attach because the debtor's rights in the
collateral were too slight to permit at-
tachment and (2) was subject to defeat
even if it attached because a security
interest collapses if the debtor's right to
the property is extinguished. The ma-
jority's result is achieved only by ignor-
ing or circumventing the plain meaning
of Article Nine and Article Two.

Prior to the enactment of the Uniform
Commercial Code, seller and buyer could
agree that, despite buyer's possession, ti-
tle to goods sold was to remain in the
seller until he was paid. Such a reserva-
tion of title under the "cash sale" doc-

trine would defeat not only a claim to
the goods by the defaulting buyer, but
also the claims of lien creditors of the
buyer, for the buyer's naked possession
could give rise to no interest to which a
lien could attach.

However, the U.C.C. specifically limits
the seller's ability to reserve title once
he has voluntarily surrendered possession
to the buyer: "Any retention or reserva-
tion by the seller of the title (property)
in goods shipped or delivered to the buy-
er is limited in effect to a reservation of
a security interest." § 2.401(a). *See
also* § 1.201(37). The drafters noted the
theory behind this provision: "Article
[Two] deals with the issues between sell-
er and buyer in terms of step by step
performance or non-performance under
the contract for sale and not in terms of
whether or not 'title' to the goods has
passed." § 2.401, Comment 1.

The majority opinion interprets
§ 2.401(a) as applying only to "credit"
sales, and of no effect where the parties
have contracted a "cash" sale. However,
the Code provision speaks of "any reser-
vation of title." It does not on its face
apply solely to credit sales. There is no
authority under the Code for the majori-
ty's restrictive interpretation. Numer-
ous courts have, in fact, applied § 2.401
to cash sales. *See e. g., Guy Martin
Buick, Inc., v. Colo. Springs Nat'l Bank,*
32 Colo.App. 235, 511 P.2d 912 (1973);
*First Nat'l Bank of Elkhart Cty. v.
Smoker,* 11 U.C.C.Rep. 10 (Ind.App.,
1972); *English v. Ralph Williams Ford,*
17 Cal.App.3d 1038, 95 Cal.Rptr. 501
(1971); *Evans Products v. Jorgensen,* 245
Or. 362, 421 P.2d 978 (1966). I have
been unable to find even one case sug-
gesting that § 2.401 applies only to cred-
it sales.

▇▇ If the majority were correct, the
Section would be merely definitional, for
a credit sale is but a sales transaction in
which the seller reserves a security inter-
est. However, § 2.401 is not definitional.
It is operational and concerns the effect
of transfer of possession under a sales
contract upon any reservation of title.
Neither law nor logic leads me to believe

APPENDIX—Continued

that § 2.401 is correctly interpreted to exclude cash sales.

The majority also suggest that Stowers' interest cannot be characterized as a security interest subject to Article Nine requirements and priorities since, the majority conclude, such interests must be "consensual". While it is true that many interests governed by Article Nine are consensual, §§ 9.102; 9.102, Comment, the Code clearly subjects Article Two security interests arising not by consent but by operation of law to Article Nine. *See* §§ 2.401(a); 9.113; 9.113, Comment 2. *See also* §§ 2.326; 9.114; 9.102, Comment 1.

Since Stowers' interest upon delivery of the cattle to Samuels was limited to a security interest subject to Article Nine, §§ 2.401(a); 9.113, the validity of C.I.T.'s Article Nine interest becomes crucial. If C.I.T. is the holder of a perfected Article Nine interest in the collateral claimed by Stowers through its unperfected § 2.401 interest, C.I.T.'s interest will prevail over Stowers', § 9.312(e).

■ The majority assert that C.I.T. cannot claim an interest in the cattle because Samuels' interest was too slight to permit attachment. *See* § 9.204(a). As I noted in my discussion of rights under § 2.403, this argument ignores the significance of § 2.403(a) and § 1.201(32), (33). The Code anticipates a situation where the interest of an unpaid cash seller who has delivered goods to a breaching buyer is subordinated to the interest of "purchasers" of the buyer. Lien creditors are included in the definition of "purchasers"; in order that there *be* lien creditors, the buyer's interest must be great enough to allow attachment. Therefore, however, Samuels' interest upon delivery of the cattle is defined, and however slight or tenuous or marginal it was, it was necessarily great enough to permit attachment of a lien, including C.I.T.'s Article Nine interest.

The majority find that even if attachment occurred, C.I.T.'s interest would be defeated by Stowers' reclamation. The theory behind this argument is that the rights of the Article Nine secured party are at best coextensive with the rights of the debtor; if the debtor loses his rights, the security interest too is lost.

■ Upon nonpayment Samuels lost the right to retain or dispose of the property, but the Code recognizes that the breaching buyer had the power to encumber, despite nonpayment, so long as he retained possession. §§ 2.403(a); 1.201(32), (33). In the instant case, this power arose as a result of Stowers' delivery, and it did not terminate while the goods remained in Samuels' hands. The whole point of Article Nine is the continuity of perfected security interests *once they have properly attached,* despite subsequent loss of control or possession of the collateral by the debtor. § 9.201. Article Nine does not except an unpaid cash seller from this overall plan. In fact it specifically provides a means for him to perfect and become prior to previous perfected security interests. § 9.312(c), (d).

To hold that a reclaiming seller is given the power to sweep away a security interest which was able to attach only as a direct and Code-approved result of his voluntary act of delivery to the buyer would require ignoring the meaning and interplay of Article Two and Article Nine. Article Two recognizes the continuous vitality and priority of an Article Nine interest over the rights of an aggrieved seller. *See* §§ 2.403(a); 2.507, Comment 3; 2.702(c). It would be error to believe that a proper analysis of Article Nine could require the extinction of an identical Article Nine interest in the very circumstances specified by Article Two as triggering the priority of lienor over seller. *See* §§ 2.403(a); 2.507(b); 2.507, Comment 3; 2.702(b), (c); 9.102; 9.107(1); 9.312(c), (d).

Any seeming unfairness to Stowers resulting from the Code's operation is illusory, for the sellers could have protected their interests, even as against C.I.T.'s prior perfected interest, if they had merely complied with the U.C.C.'s pur-

APPENDIX—Continued

chase-money provisions. §§ 9.107, 9.312(c), (d). The Code favors purchase-money financing, and encourages it by granting to a seller of goods the power to defeat prior liens. The seller at most need only (1) file a financing statement and (2) notify the prior secured party of its interest before delivery of the new inventory. The procedure is not unduly complex or cumbersome. But whether cumbersome or not, a lender who chooses to ignore its provisions takes a calculated risk that a loss will result.

In the instant case Stowers did not utilize § 9.312's purchase-money provision. The sellers never perfected. Thus, in a competition with a perfected secured party they are subordinated, and, in this case, lose the whole of their interests. See §§ 9.201, 9.301, 9.312(e).

V. Rights under the Bankruptcy Act

■■■ C.I.T.'s perfected security interest is not subject to defeat by the Trustee in Bankruptcy Mahon. If, however, C.I.T. were to have abandoned its claim against Samuels, Stowers would nonetheless have lost in a priority contest with the Trustee.

■■■ Bankruptcy Act § 70c confers the status of a hypothetical lien creditor upon the Trustee. Mahon could assert those § 70 rights against Stowers, an unperfected secured · party, and would prevail under U.C.C. § 9.301(a)(2), (c).

■■■ Bank of Marin v. England, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966), does not strengthen Stowers' claim. In that case the drawer of a check took bankruptcy after the check had been issued but before presentment. The drawee paid on the instrument without notice or knowledge of the bankruptcy. Such payment was in compliance with U.C.C. §§ 4.303, 4.401 and 4.402. The Supreme Court found that an application of Bankruptcy Act § 70d under these circumstances would work a hardship on the payee or drawee. Bank of Marin has been critically attacked by scholars, see e. g., 4A Collier on Bankruptcy, § 70.68 at 755 (14th Ed. 1971). In any event, the "inequity" in Bank of Marin occurred when a loss resulted from the effect of a federal statute upon good faith compliance with state statute. The federal statute's operation and effect were wholly beyond the control of the innocent drawee. In the instant case Stowers' loss resulted from his own failure to comply with state law which would have enabled him to perfect his purchase money security interest. The loss could have been avoided through his own efforts. This is not the kind of loss equity protects against.

[End of Appendix]

GEE, Circuit Judge (specially concurring):

Troubled by the seeming harshness of the result, I nevertheless concur, despite its effect to force a cash seller to act like a credit seller to protect his interest. It asks much of these small cattle dealers, selling their cattle for cash, that they wrangle with the complicated provisions of art. 9 to protect themselves against an insufficient funds check, but this seems to be the clear demand of the Texas Code. In the normal course of dealing, such a check will give a seller an action on the instrument as well as for breach of the contract of sale, all in addition to the remedy of reclamation read into the Code by some courts. This protection is adequate except in cases such as this, where the buyer writes a bad check and subsequently declares bankruptcy. All sellers who accept checks run the same risk—some take out insurance against such a loss by the simple procedure of drawing up and filing a security agreement giving them rights in the goods sold to secure the purchase price.

Such an agreement can be filed in advance, so there is no need to wait until one receives a check to fill out a security agreement and race to file it before the bank dishonors the check. The very nature of this transaction recommended taking this simple additional precaution

of filing a purchase money security interest—the cows were immediately slaughtered, making it impossible to recover the "goods" if the deal fell through, and, too, the delayed pricing arrangement transformed the "cash sale" into a credit transaction for all commercial purposes regardless of how the two parties characterized it. Comment 6 to art. 2–511 says acceptance of a check postdated by even one day "insofar as *third parties* are concerned, amounts to a delivery on credit and the [seller's] remedies are set forth in the section on buyer's insolvency (§ 2–702)." As Judge Hughes pointed out in the district court opinion, Stowers' delivery of livestock to the bankrupt without perfecting a security interest therein placed the bankrupt in such a position that it could transfer good title to a good faith purchaser for value, which is precisely what Samuels did.

AINSWORTH, Circuit Judge, with whom BELL, INGRAHAM, COLEMAN and GEWIN, Circuit Judges, join (dissenting):

A divided en banc court has decided that the majority panel opinion of Judge Ingraham (concurred in by Judge Ainsworth) should be reversed and the district court's judgment should be affirmed in accordance with Judge Godbold's dissenting opinion. It is our view that in doing so, the court has erred in its application of the Texas Business and Commerce Code (U.C.C.) to the undisputed facts. The majority has relied on Code provisions which are applicable to credit rather than cash transactions involved here. Code provisions relative to good faith purchasers have also formed the basis of the prevailing opinion though C.I.T., the finance company, which now prevails in its claim, is not a good faith purchaser, as we shall show. Nor does equity support the majority court's decision as the result of which 15 cattle farmers lose the proceeds of their livestock amounting to $54,793.26 which are awarded to a competing claimant, C.I.T. C.I.T. thus achieves a windfall at the expense of the cattlemen who sold their cattle to the packer in the usual manner of the trade for cash, but were paid with checks later dishonored by the bank on which they were drawn.

When the Supreme Court remanded this case to us, it said:

We hold that, on the undisputed facts of this case, nothing in the Packers and Stockyards Act or the regulations issued by the Secretary under the Act overrides the Texas Business and Commercial Code in determining the respective rights of the parties to the funds held by the trustee. We do note, however, that an isolated passage at the end of the Court of Appeals' opinion states that the "Packers and Stockyards Act and Regulations 201.42 and 201.99 thereunder comprise a course of dealing and usage of trade known to both the bankrupt packer and C.I.T., which had financed it for an extended period." 483 F.2d 557, 563. While we hold that the Act and regulations do not *ex proprio vigore* override the provisions of Texas law determining priorities to the funds in question, we do not mean to say that a course of conduct mandated by the Act or regulations might not, just as any other course of conduct, be relevant or even dispositive under state law. The District Judge, herself a longtime Texas practitioner and then state court judge before taking the federal bench, determined otherwise here. To the extent that respondents in appealing to the Court of Appeals challenged that determination, it will of course be open for adjudication in the Court of Appeals on remand.

The petition for certiorari is granted and the judgment of the Court of Appeals is reversed and the case is remanded for proceedings not inconsistent with this opinion.

416 U.S. at 113–114, 94 S.Ct. at 1632.

The panel (Ainsworth, Godbold, Ingraham, JJ.) considered the matter on remand in light of the Supreme Court's directions. Basing its opinion on provi-

sions of the Texas Business and Commerce Code, the panel held (Godbold, J., dissenting) that the judgment of the district court should be reversed and the proceeds of the cattle paid to the cattle farmer claimants in the bankruptcy proceedings.

The majority panel decision written by Judge Ingraham correctly interprets the Texas Business and Commerce Code in light of the undisputed facts. In a lengthy and scholarly opinion Judge Ingraham has carefully analyzed the applicable Code provisions and has shown the inapplicability of the Code sections relied on by Judge Godbold in his dissent. Judge Ingraham's opinion is unassailable under the circumstances of this case. It is based upon correct application of the standard U.C.C. provisions adopted by the Texas Business and Commerce Code, and the opinion should have been affirmed by the en banc court. Not only would the result comport with proper interpretations of the Code, and the undisputed facts, but it would likewise do equity between the parties. We shall draw liberally on Judge Ingraham's well-reasoned opinion for support of our views in this dissent.

We begin with the undisputed facts as to which the Supreme Court stated in its opinion:

> The uncontested facts in this case are contained in the findings of the bankruptcy referee. The referee found that respondents, for a period of some ten days before Samuels filed a Chapter XI petition under the Bankruptcy Act, had been selling live cattle to Samuels for slaughter on a "grade and yield" basis, and that this was a recognized custom and usage in the trade. Under this usage the contract price is left open at the time of delivery to the purchaser, who slaughters the livestock and allows the carcasses to chill for approximately 24 hours. At that time they are graded by the United States Department of Agriculture and the price is determined. The purchaser then gives the seller a check for the established amount. The ref-

eree further found that Samuels was subject to the regulations of the Packers and Stockyards Act, and that all of the livestock in question had been delivered to Samuels at its plant in Mount Pleasant, Texas, where it was slaughtered and then graded by the Department of Agriculture.

> Until the livestock is actually graded and the yield determined, the sellers can identify their particular livestock, but once the carcasses are processed and the meat packaged, identification is no longer possible. When the petition for bankruptcy was filed in this case, none of the respondents was able to identify his own particular livestock, but the referee found that at least some of the carcasses sold by respondents were on Samuels' premises at that time. The referee also determined that no proceeds from sale of packaged meat could be identified as realized from carcasses delivered by respondents.

> Examining the competing claims, the referee found that at all times material to the action C.I.T. was the holder of a duly perfected security interest in all livestock, animal carcasses, packaged and unpackaged meat, packing materials, and other inventory owned by Samuels or in which Samuels may have had an interest. At the time the bankruptcy petition was filed Samuels was indebted to C.I.T. in an amount in excess of $1,800,000. C.I.T. had been advancing large sums weekly to Samuels, and the bankruptcy was precipitated on May 23, 1969, when C.I.T., deeming itself to be insecure, refused to make a weekly advance of approximately $184,000 which Samuels needed to continue its operations. The referee found that C.I.T. "knew or should have known" of the method by which Samuels bought livestock from respondents on a grade-and-yield basis. He further found that no respondent held a security agreement with Samuels, and that none had filed a financing statement reflecting the transactions with Samuels.

The referee reasoned from these facts that respondents and Samuels had intended to transact their sales business on a cash, rather than a credit, basis, and that title to the livestock "did not pass from plaintiff to bankrupt until payment was made to plaintiff." Therefore, he concluded, C.I.T.'s perfected lien could not attach to the livestock in Samuels' inventory until the checks issued in payment were subsequently honored. Any other decision would, he said, make the cattle sellers "a species of involuntary creditor against their wishes and intent," although they had complied with normal selling arrangements under the Packers and Stockyards Act. He found it unnecessary for the respondents to identify proceeds from the sale of specific carcasses which they had delivered, and placed the duty on C.I.T. to show that the funds to which it laid claim had not been received from the sale of carcasses furnished by respondents.

416 U.S. at 102–104, 94 S.Ct. at 1627.

Continuing with a consideration of other undisputed facts, the Referee found that "a crisis was precipitated on May 23, 1969" when C.I.T. refused to make a further weekly advance of $184,-000 and "took steps to commence the liquidation of its outstanding loans to Samuels." On the same day Samuels filed the Chapter XI bankruptcy petition and a receiver was appointed, later a trustee, to continue the operations of the packer. Samuels continued to operate under a receivership, and it was not until May 6, 1970, about a year later, that the company was finally adjudicated a bankrupt. Further, the Referee held in his findings that in the beginning of the bankruptcy proceedings, "As a matter of necessity arrangements had to be worked out for the trustee under the direction of the court to sell the perishable meat on hand with the proceeds to be held subject to the order of the court so that these contests could be fought out over money. That has been done." The bankrupt slaughtered the animals and sold meat at wholesale to various customers in intrastate and interstate commerce.

According to the trustee's report, "there is no possibility of any dividend to be paid to general creditors."

The cattle had been sold for cash by the 15 cattle farmers to Samuels on various dates from May 12 through May 23, 1969, in accordance with the Packers and Stockyards Act, 7 U.S.C. § 181 et seq. and regulations thereunder, on a so-called grade and yield basis.[1] The Refer-

---

1. The applicable regulations are found in 9 C.F.R. as follows:

§ 201.43 Payment and accounting for livestock and live poultry.

. . . . .

(b) *Purchasers to pay promptly for livestock.* Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and the determination of the amount of the purchase price, transmit or deliver to the seller or his duly authorized agent the full amount of the purchase price, unless otherwise expressly agreed between the parties before the purchase of the livestock. Any such agreement shall be disclosed in the records of any market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction. The provisions of this section shall not be construed to permit any transaction prohibited by § 201.61(a) relating to financing by market agencies selling on a commission basis. (Emphasis added.)

. . . . .

§ 201.99 Purchase of livestock by packers on a carcass grade, carcass weight, or carcass grade and weight basis.

(a) Each packer purchasing livestock on a carcass grade, carcass weight, or carcass grade and weight basis shall, prior to such purchase, make known to the seller, or to his duly authorized agent, the details of the purchase contract. Such details shall include, when applicable, expected date and place of slaughter, carcass price, condemnation terms, description of the carcass trim, grading to be used, accounting, and any special conditions.

ee also found that as soon as the bankruptcy petition was filed, the bank on which the checks had been drawn to pay the cattle sellers stopped payment and returned them marked not sufficient funds.

.It is, of course, undisputed that the transactions involved here by the sellers of cattle were on a cash, not a credit, basis with the packer. This being true, Judge Ingraham in the majority panel opinion reasoned as follows:

Underlying the different characteristics and consequences of cash and credit sales are the expectations and intentions of the three parties con-,cerned. When goods are sold for cash, the seller is assuming virtually no risk of loss because he believes that he has full payment for the goods in his hands. When the sale is for credit, however, the seller assumes a far more substantial risk and voluntarily relinquishes the incidents of ownership to the buyer. The buyer, possessed of these incidents of ownership, is capable of conveying title to a bona fide purchaser, completely terminating the rights of the seller in the goods. The

credit seller recognizes that he will receive full payment for his merchandise only if the business of the buyer progresses normally and sales are made to third parties in the normal course of business. Note, The Owner's Intent and the Negotiability of Chattels: A Critique of Section 2–403 of the Uniform Commercial Code, 72 Yale L.J. 1205, 1220 (1963). Although commercial transactions and the law governing such relationships has developed significantly since the conception of these doctrines, this reasoning with respect to the different risks assumed by the different sellers underlie and differentiate the two concepts and is as valid a distinction today as it was when the doctrines were originally conceived.

The Uniform Commercial Code as adopted by the State of Texas has to some extent modified the common law doctrines of cash and credit sales. It is clear that the historical concept of passing title to goods is not emphasized in the Code, and the location of title generally is not regarded as being determinative of the rights of adverse

(b) Each packer purchasing livestock on a carcass grade, carcass weight, or carcass grade and weight basis, shall maintain the identity of each seller's livestock and the carcasses therefrom and shall, after determination of the amount of the purchase price, transmit or deliver to the seller, or his duly authorized agent, a true written account of such purchase showing the number, weight, and price of the carcasses of each grade (identifying the grade) and of the ungraded carcasses, an explanation of any condemnations, and any other information affecting final accounting. Packers purchasing livestock on such a basis shall maintain sufficient records to substantiate the settlement of each transaction.

(c) When livestock are purchased by a packer on a carcass weight or carcass grade and weight basis, purchase and settlement therefor shall be on the basis of carcass price. This paragraph does not apply to purchases of livestock by a packer on a guaranteed yield basis.

(d) Settlement and final payment for livestock purchased by a packer on a carcass weight or carcass grade and weight basis shall be on actual (hot) carcass weights.

The hooks, rollers, and gambrels or other similar equipment used at a packing establishment in connection with the weighing of carcasses of the same species of livestock shall be uniform in weight. The tare weight shall include only the weight of such equipment: *Provided, however,* That until July 1, 1968, these packers who shroud carcasses before weighing them may include in the tare weight the average weight of the shrouds and pins.

(e) Settlement and final payment for livestock purchased by a packer on a USDA carcass grade shall be on an official (final— not preliminary) grade. If settlement and final payment are based upon any grades other than official USDA grades, such other grades shall be set forth in detailed written specifications which shall be made available to the seller or his duly authorized agent. For purposes of settlement and final payment for livestock purchased on a grade or grade and weight basis, carcasses shall be final graded before the close of the second business day following the day the livestock are slaughtered.

[33 F.R. 2762, Feb. 9, 1968, as amended at 33 F.R. 5401, Apr. 5, 1968]

parties. Helstad, Deemphasis of Title Under the Uniform Commercial Code, 1964, Wisconsin L.R. 362. Instead of implementing the fictional concept of title, the countervailing interests of the parties are sometimes defined in terms of various rights, privileges, powers and immunities.

But even though the title concept is so reduced in significance, the Code recognizes and adopts the fundamental distinctions of the common law between cash and credit sales, at least with respect to the rights of the unpaid seller against the defaulting buyer. *The Code deals with a sale on credit in provisions separate from those dealing with cash sales.*

.    .    .    .    .

(Emphasis added.) 510 F.2d at 144.

Further, as to the Code provisions affecting cash sales, Judge Ingraham said:

With respect to cash sales, however, § 2.507 of the Code explicitly recognizes that "unless otherwise agreed," "[w]here payment is due and demanded on the delivery to the buyer of goods . . ., [the buyer's] right as against the seller to retain or dispose of them is conditional upon his making payment due." Texas Business and Commerce Code, § 2.507(b) (1968). Like the cash sale doctrine at common law, § 2.507 provides that when the buyer is to pay cash for the goods, the validity of the transaction is dependent upon his making payment, and when the buyer fails to pay, he does not even have the right to possess the goods. Absolute ownership does not pass to the buyer until payment is complete.

The limited interest conveyed to the buyer prior to payment under § 2.507(b) is reemphasized in § 2.511(c), which deals specifically with the situation where payment for goods is made by check that is later dishonored. Section 2.511(c) provides that payment by check "is conditional and is defeated as between the parties by dishonor of the check on due presentment." Texas Business and Commerce Code, § 2.511(c) (1968). Underlying this provision is the principle that, in order to encourage and facilitate commercial sales and economic growth generally, the recipient of a check in payment for goods "is not to be penalized in any way" for accepting this commercially acceptable mode of payment. *Id.* Comment 4.

510 F.2d at 145–146.

On July 23, 1969, two weeks after Samuels' Chapter XI petition in bankruptcy was filed, C.I.T. filed a reclamation petition relative to its claims to the assets and inventory of the bankrupt and in effect claimed all of Samuels' assets under its previously recorded lien. Included therein, of course, was a claim by C.I.T. to the proceeds of the sale of the cattle which belonged to the 15 livestock producers whose checks in payment thereof had been dishonored by the bank when C.I.T. declined further to finance the operations of the packer.

On August 13, 1969, the Referee issued his order on the reclamation petition of C.I.T. which reads in part as follows:

IT IS FURTHER ORDERED that C.I.T. Corporation is a secured creditor with respect to all of the assets described in its Petition for Reclamation save and except for the following assets of the Debtor as to which the determination of such secured status is reserved for further consideration by the Court:

(a) Accounts receivable of the Debtor resulting from sales or deliveries by the Debtor on May 23, 1969, and as to which accounts receivable *no advances were made by C.I.T. Corporation and any other accounts receivable as to which C.I.T. Corporation made no specific advances.*

(Emphasis added.)

It is unreasonable to require a cash seller, such as the cattlemen here, to follow Code provisions for obtaining a security interest which are obviously applicable only to credit transactions. As Judge Ingraham said:

. . . In a cash sale the seller believes, and not unreasonably, that he has his payment in hand. The only phase of the transaction left uncompleted is the seller's cashing the check. All he has to do is put the check in the mail and wait for it to be cleared at the bank, or take the check directly to the bank and cash it. Because the limited time sequence, extending from the receipt of the check to its being cashed, is so short, it would be unreasonable to require the cash seller to follow the litany of the Code and take measures to perfect an alleged security interest. *See* Corman, Cash Sales, Worthless Checks and the Bona Fide Purchaser, 10 Vanderbilt L.R. 55, 65 (1956).

510 F.2d at 149.

Further, Judge Ingraham concluded, in this regard:

Supporting the conclusion that the seller's rights are not cut off under Article 9 are the explicit provisions of the Code. Section 9.102 and the accompanying comments broadly define the scope of Article 9, but carefully limit its application to commercial transactions in which the parties intend to create security interests. As found by the referee, and it has not been contested in this court, each of the cattle sellers involved in this litigation regarded the sale to Samuels as a cash transaction, and there is nothing in the record to suggest that any of the parties involved thought it was anything but a cash sale. Selling goods on a credit basis involved the assumption of a far greater risk on the part of the seller than when the goods are sold for cash. To summarily label these sellers as holders of unperfected security interests would change entirely the nature of the transaction as it was intended by the parties, and alter the cash seller's status to one who thinks he has full payment for his goods to one in which he stands as a mere unsecured creditor. The Code was designed to supplement the agreement between the parties in commer-

cial transactions where the parties failed to provide, not completely change the character of an existing relationship. *See* Bunn, Freedom of Contract Under the Uniform Commercial Code, 2 B.C.Ind. & Com.L.R. 59 (1960); J. White and R. Summers, The Uniform Commercial Code 6 (1972).

510 F.2d at 149–150.

Samuels not having paid for the cattle and its right as against the sellers to retain or dispose of them being conditional under Texas Code §§ 2.507(b) and 2.511(c), C.I.T.'s rights as lienholder "derived solely from the rights of the debtor, also terminated." 510 F.2d at 150.

### Is C.I.T a Good Faith Purchaser Under the Code?

The majority having conceded that the transactions here were sales for cash and payment not having been made to the sellers because the checks were dishonored by the bank after the intervening bankruptcy petition of Samuels, the only point left upon which the majority can possibly rely is that C.I.T. and the trustee were good faith purchasers for value. In this regard the majority per curiam adds to Judge Godbold's dissenting opinion footnote 3, which states in part as follows:

Also we note a matter not mentioned in the dissenting opinion of Judge Godbold. The District Court, which accepted the Referee's findings of fact but rejected his conclusions of law, held that C.I.T. and the trustee in Bankruptcy were good faith purchasers for value, *and the Supreme Court in its opinion referred to them as such.* 416 U.S. at 104, 94 S.Ct. at 1628, 40 L.Ed.2d at 84.

(Emphasis added by this dissenting opinion.)

That part of the above quotation, "and the Supreme Court in its opinion referred to them as such," infers that the Supreme Court held that C.I.T. and the trustee were good faith purchasers for value.

But the Supreme Court did not so hold. Reference to the page citation from whence the statement in footnote 3 of the majority per curiam is apparently derived discloses the following sentence in the Supreme Court opinion: "Delivery of the cattle to Samuels on this basis enabled it to transfer good title to a good-faith purchaser for value, a category of persons which included both C.I.T. and the trustee in bankruptcy." (Footnote omitted.) But reference to the entire paragraph from which the sentence is quoted discloses that the Supreme Court did not make a finding to the effect that C.I.T. and the trustee were good faith purchasers for value but merely recited that *the district court* had so held.[2] We quote the entire paragraph from the Supreme Court opinion to show that the majority's inference that the Supreme Court has already held that C.I.T. and the trustee are good faith purchasers for value is incorrect and not in context.

The District Court accepted the referee's findings of fact but reversed on the law. Turning to the provisions of the Texas Business and Commercial Code, which are largely counterparts of the Uniform Commercial Code, the court found that the respondents by their delivery of the cattle had retained only a security interest in those animals and the proceeds therefrom.[1] It further found that the respondents had taken no action to perfect their security interest[2] nor attempted to utilize any right of reclamation they might have had under Texas law.[3] *Delivery of the cattle to Samuels on this basis enabled it to transfer good title to a good-faith purchaser for value, a category of persons which included both C.I.T. and the trustee in bankruptcy.*[4] The District Court also found that respondents were unable to "es-

tablish their right to possession by ownership . . . [by] identify[ing] positively the property sought to be reclaimed in either its original or substituted form."

(Footnotes omitted.) (Italics supplied.) 416 U.S. at 104, 94 S.Ct. at 1628. The italicized sentence above is virtually in the identical language used by the district court and reproduced in footnote 2, ante.

There would have been no reason for the Supreme Court to remand this case to us for further consideration had it held in its opinion that C.I.T. and the trustee were good faith purchasers for value. Such a holding would have ended the matter. Of course, as we have pointed out, the Supreme Court made no such holding. In no sense can C.I.T. be considered a good faith purchaser for value. C.I.T., of course, did not purchase anything—the cattle here, or the meat, or anything else. It is in the finance business and it was the principal source of working capital for Samuels. Its role as shown in this case was to provide for Samuels' financial needs by accounts receivable and inventory financing on a weekly basis, which it did from June 18, 1963. In turn it was granted, and recorded, a lien and security interest covering all inventory, merchandise, accounts receivable, etc., of Samuels. C.I.T. claims its lien rights to the proceeds of the cattle farmers' livestock here under Code § 2.403(a) which provides in part that "a person with voidable title has power to transfer a good title to a good faith purchaser for value." Status as a purchaser is conferred on a lienholder by virtue of Texas Code § 1.201(32), (33). The opinion of Judge Ingraham completely refutes C.I.T.'s claim of good faith purchaser for value as follows:

The third question is whether C.I.T. qualifies as a good faith purchaser. Un-

---

**2.** The district judge held in her written order in this respect as follows:

C. Plaintiffs, by making delivery of the livestock to the Bankrupt without perfecting a security interest therein, placed the Bank-

rupt in such a position that it could transfer good title to a good faith purchaser for value including C.I.T. and the Trustee, as provided in Section 2.403(a) of the Code.

Order dated November 24, 1972.

der § 2.403 of the Code, the buyer of goods from a seller is vested with a limited interest that it can convey to a good faith purchaser and thus create in the purchaser a greater right to the goods than the buyer itself had. This is possible even when the buyer obtains the goods as a result of giving a check that is later dishonored or when the purchase was made for cash. But in order to attain this status, the proponent must be a *purchaser* that gives *value* and acts in *good faith*. While C.I.T. gave value for the goods within the meaning of the Code, it failed to meet the test of a purchaser or one acting in good faith.

With regard to C.I.T.'s status as a purchaser, the Code broadly defines this term as one who take "by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property." Texas Business and Commerce Code, § 1.201(32) (1968); *see id.* § 1.201 (33). *As noted earlier, C.I.T. does not have an interest in the cattle because its rights in the collateral are derivative of its debtor's rights in it. When Samuels failed to pay for the cattle, its rights in the cattle terminated and thus so did C.I.T.'s.* C.I.T.'s status as a good faith purchaser is also defeated with regard to its acting in good faith. The Code defines good faith as "honesty in fact in the conduct or transaction concerned." Texas Business and Commerce Code, § 1.201(19) (1968). Implicit in the term "good faith" is the requirement that C.I.T. take its interest in the cattle without notice of the outstanding claims of others. *See Greater Louisville Auto Auction v. Ogle Buick, Inc., supra,* (Ky.), 387 S.W.2d (17) at 21. *See also Fidelity and Casualty Co. v. Key Biscayne Bank,* 501 F.2d 1322, 1326 (5th Cir. 1974).

It is true that the evidence does not reveal any breach of an express obligation on C.I.T.'s behalf to continue financing the packing house after Samuels filed a petition in bankruptcy.

Nor does the good faith element require the creditor to continue to finance the operation of a business when it is apparent that the business is unprofitable and is going bankrupt. But because of the integral relationship between C.I.T. and Samuels, we do not see how C.I.T. could have kept from knowing of the outstanding claims of others. C.I.T. maintained close scrutiny over the financial affairs of Samuels' operations. C.I.T. had been financing Samuels' packing house operations for at least six years, and the financing involved the flow of millions of dollars. The amount of cash advances made to Samuels was not predetermined or determined arbitrarily, but was calculated only after C.I.T. examined weekly the outstanding accounts and the current inventory of the business. From such a continuous and prolonged study of the business to determine the amount of each weekly advance, C.I.T. must have been intricately aware of the operations and financial status of the business.

Since C.I.T. was so intimately involved in Samuels' financial affairs, it must have known that when it refused to advance additional funds, unpaid checks issued to cattle sellers by Samuels would be dishonored. Samuels' operations were totally dependent on the financing of C.I.T. and both parties knew it. From its enduring involvement in the weekly financing, C.I.T. apparently knew that Samuels was purchasing and processing cattle up until the very time of filing the petition. Knowing that cattle had been purchased and processed immediately preceding its refusal to advance more money, C.I.T. must have known as a result of this refusal that some cattle sellers who had recently delivered their cattle to Samuels would not be paid. Because C.I.T. and Samuels were so intertwined in the management of the financial affairs of the business, we do not think that C.I.T. can plausibly claim, in complete honesty, that it was unaware of the claims

of the unpaid cattle sellers. Since C.I.T. was aware of these outstanding claims, it does not qualify as a good faith purchaser.

(Emphasis added.) 510 F.2d at 151–152.

It is important to remember, too, that the Referee in his findings of fact, which were accepted by the district court, held that "C.I.T. knew or should have known of the manner by which the bankrupt bought livestock from the plaintiffs on a grade and yield basis as hereinabove described."

The record does not disclose that any funds were advanced by C.I.T. on the faith of plaintiff's cattle, delivered to Samuels on the eve of its default and bankruptcy petition, being in Samuels' inventory. In fact, it is quite clear that C.I.T.'s decision not to advance funds to Samuels in the week involved directly resulted in Samuels' filing its petition in bankruptcy and the bank thereafter refusing to honor plaintiff's checks in payment of the cattle.

C.I.T.'s intimate knowledge over a long period of years of Samuels' financial affairs, having financed the packer on a weekly basis, shows beyond doubt that C.I.T. knew its decision not to advance further funds to Samuels, would result in the cattle farmers involved here not being paid for their cattle. To allow C.I.T. under the guise of a good faith purchaser now to pick up all the proceeds of the cattle farmers' livestock does not comport with section 2.403 of the Code or with any other provision of the U.C.C. Its lien rights to the proceeds of the cattle here, as we have pointed out, were derivative of Samuels' rights. Samuels had no right to the proceeds since it had not paid for the cattle. Therefore, C.I.T. had no right thereto. Thus the majority opinion cannot stand logical scrutiny or the provisions of the Uniform Commercial Code adopted by the Texas Business and Commerce Code.

We believe that the court has an affirmative obligation to do equity in this bankruptcy proceeding in accordance with the Supreme Court's admonition in the (1966) case of *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197, where the Court said, "There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Surely there is no equity in the court's awarding the proceeds of the cattle farmers' livestock to C.I.T., nor is such an award in accordance with the applicable provisions of the U.C.C.

The judgment of the district court should be reversed and the Referee's judgment in favor of plaintiff cattle farmers should be reinstated.[3]

---

**3.** The sellers' rights as against the trustee are adequately treated by Judge Ingraham's opinion, *see* 510 F.2d at 152–153.

