DIXIE BONDED WAREHOUSE AND
GRAIN COMPANY, INC., Plaintiff,

v.

ALLSTATE FINANCIAL
CORP., Defendant.

Civ. A. No. 84–378–3–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 5, 1991.

**1544**

E. Kendrick Smith, Atlanta, Ga., for plaintiff.

Cater S. Clay, Macon, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

On September 5, 1984, plaintiff Graniteville Company ("Graniteville") filed its complaint for interpleader against Bleckley Lumber Company, Inc., doing business as Bleckley Cotton Company ("Bleckley"), Dixie Bonded Warehouse & Grain Company, Inc. ("Dixie"), and Allstate Financial Corporation ("Allstate") stating that: (1) pursuant to Graniteville's purchase order, Bleckley, on April 13, 1984, shipped 77 bales of raw cotton to Graniteville's Augusta, Georgia fibers division for which Graniteville owes $30,160.11; (2) Bleckley originally purchased the cotton from, but never made payment to, Dixie for resale to Graniteville; (3) prior to shipment, Allstate notified Graniteville that Bleckley had assigned all accounts receivable to Allstate, and that Graniteville should make payment directly to Allstate for the subject cotton; (4) Graniteville is unable to resolve the dispute between Dixie and Allstate with regard to whom payment is due; and (5) Graniteville

has paid the $30,160.11 into the registry of the court to be disbursed as the court directs after determining to whom it is due. This is the issue for the court's resolution.

## PROCEDURAL HISTORY

Allstate filed its response and claim in interpleader asserting that in June of 1983, Bleckley and its principal, William Carlton Lawson ("Lawson"), entered into an agreement with Allstate ("the Agreement"). (Exhibit A). By virtue of the Agreement, Allstate alleges, Allstate acquired a perfected security interest in all of Bleckley's present and thereafter-created accounts receivable, including Graniteville's subject $30,160.11. Bleckley and Lawson are, therefore, indebted to Allstate for more than $1,000,000.00 for advances by Allstate to Bleckley for accounts receivable which proved worthless. Pursuant to Georgia's Uniform Commercial Code §§ 11–9–318, *et seq.*, Allstate claimed to be a good faith purchaser with a security interest entitling Allstate to the entire $30,160.11.

Dixie answered that it is entitled to $29,776.39 of the funds in the court registry. Dixie alleged that: (a) "Dixie delivered said cotton to Bleckley and Bleckley accepted same with the understanding that Bleckley would have only temporary custody of the cotton until Dixie received credit for the check given by Bleckley in payment thereof;" and (b) Allstate, who through its employee working in Bleckley's office was monitoring all of Bleckley's checks, and Bleckley together made the decision not to pay Dixie for the cotton by dishonoring Bleckley's check. Allstate, Dixie argues, is not entitled to good faith purchaser protection under O.C.G.A. §§ 11–2–507 and 11–2–702, and, therefore, failed to obtain a perfected security interest in Bleckley's accounts receivable as they pertain to the cotton delivered Bleckley by Dixie.

On August 30, 1985, Dixie, with leave of the court, filed an amended answer and cross-claim alleging that on April 11, 1984, Bleckley improperly shipped Dixie's 77 bales of cotton to Avondale Mills in Sylacauga, Alabama. Dixie asserted that on April 19, 1984, pursuant to O.C.G.A. §§ 11–2–507

and 11–2–702, Dixie served upon Avondale Mills, with knowledge of same by Bleckley and Allstate, a written demand that the cotton be returned to Dixie. By virtue of this transaction, Dixie alleges, Allstate owes Dixie $28,344.37.

With leave of the court, Dixie filed a second amendment to its cross-claim and asserted that Blount's Bonded Warehouse ("Blount") on April 12 and 13, 1984, sold to Bleckley cotton which Bleckley shipped, without paying Blount, to Dundee Mills and Henderson Mills. Dundee and Henderson paid Allstate for these shipments; Blount remained unpaid. Blount assigned its claims to Dixie, who also asserts that Allstate's failure to act in good faith precludes Allstate's assertion of secured creditor/good faith purchaser status as a shield against claims seeking payment for these additional improper shipments of cotton: $26,419.48 and $24,544.32 respectively.

In its final amendment to its cross-claim, on November 20, 1986, Dixie alleged, in an additional count against Allstate, that:

> The sale of cotton by Dixie Bonded Warehouse to Bleckley ... was obtained by Allstate through actual fraud and misrepresentations in that Allstate's agents and employees directed that a [Bleckley] check be written to [Dixie] for the purchase of cotton while Allstate had knowledge at the time these checks were written that there were insufficient funds in Bleckley's checking account to cover these checks and that these checks would not be honored.

(Fourth Amended Cross-claim, Count Four). Dixie further alleged that Allstate agents intentionally and with the purpose of inducing Dixie to sell cotton to Bleckley misrepresented that the checks would be honored. This fraud, Dixie argued, precluded Allstate from enjoying good faith purchaser status in these transactions and entitled Dixie to recovery of the outstanding sums, expenses and attorneys fees from Allstate.

Dixie premised these charges of fraud upon circumstances surrounding Allstate's employment of Ms. Betty Snoop ("Snoop"). Dixie stated the following:

> At the time that [Dixie] sold cotton to Bleckley and obtained "bad checks," [Allstate] was factoring or financing Bleckley's accounts receivable. An employee of Allstate, Betty Snoop, was working at Bleckley's office in Cochran, Georgia and she was monitoring on behalf of Allstate transactions entered into by Bleckley. She directed that the "bad checks" be written to [Dixie]. At the time these checks were written, Allstate had knowledge through its employees, Betty Snoop and Larry Winkler, that there were insufficient funds in Bleckley's checking account to cover these checks. Further, Allstate had knowledge through Winkler that any checks written on Bleckley's account would not be honored by the bank.

(Brief in Support of Motion to Amend).

Allstate, in response to Dixie's several claims and cross-claims, has continuously and vigorously asserted that it holds a perfected security interest in each account receivable that resulted from Bleckley's deliveries of cotton to third party buyers, and that Allstate owes Dixie nothing. Allstate has also argued that Dixie's correspondence in support of its numerous motions to amend contains many misrepresentations of law and fact. (Motion for Reconsideration ..., Tab 83).

Following submission of a proposed pretrial order on February 18, 1987, and a pretrial conference, this court considered Allstate's motion for summary judgment and denied the same on June 14, 1988. The court stated:

> Not wishing to open a wide avenue upon which aggrieved sellers may attack the validity of security interests, this court has considered carefully the materials presented by the parties in support of their respective positions. This court concludes that defendant Dixie, through affidavits and depositions, has presented sufficient evidence to indicate that there remains for jury consideration genuine issue of material fact. The good faith of a secured party is "obviously a material fact." *Shell Oil Co. v. Mills Oil Co., Inc.,* 717 F.2d 208, 213 (5th Cir.1983).

The validity of Allstate's secured interest, and thus its priority over Dixie, depends upon its having conducted itself in good faith. Dixie has placed Allstate's good faith in doubt. Dixie has raised questions regarding the relationship of Bleckley, Betty Snoop, and Allstate, the extent to which Allstate may have influenced certain purchasing and payment decisions, and the degree of control which Allstate asserted over the balance in Bleckley's checking account. These factual disputes preclude this court from granting defendant Allstate's motion for summary judgment.

*Graniteville Co. v. Bleckley Lumber Co.,* 687 F.Supp. 589, 593 (M.D.Ga.1988).

Following an unsuccessful mediation effort the case was placed on the January 14, 1991, civil trial calendar. Upon an additional review of the entire file, including all depositions, affidavits and exhibits, the court concluded that it had been under the misapprehension that certain material facts were yet in dispute in the case *sub judice.* Accordingly, counsel were advised that the court would take a fresh look at defendant's motion for summary judgment. Having afforded counsel an additional opportunity to address themselves to the court with regard to the facts in the present case, the court now finds the undisputed material facts to be as hereinafter set forth and makes the following conclusions of law.

## UNDISPUTED MATERIAL FACTS

Bleckley Lumber Company, Inc. was a Georgia corporation that was owned and operated by William Carlton Lawson ("Lawson"). Its principal place of business was Cochran, Bleckley County, Georgia. Doing business as Bleckley Cotton Company ("Bleckley"), Bleckley bought raw baled cotton and sold it to various cotton mills. Lawson was at all times the "hands on" manager of all operations at Bleckley.

Dixie is a Georgia corporation which has its principal place of business in Hawkinsville, Georgia, approximately 11 miles from Cochran. Dixie is owned by Wendell Dunaway ("Dunaway"), president, and by Douglas M. Watson ("Watson"). Dixie had, in 1983, been selling cotton to Bleckley and other enterprises owned by Lawson for some 15 years.

Dixie had always taken Bleckley's checks and, until the present dispute arose, had never had problems collecting on Bleckley checks. Dunaway had been Dixie's president for the last two years and had, himself, sold Bleckley approximately 1,500 bales of cotton valued at approximately $400,-000.00. While Dixie and Blount, pursuant to § 9–312 of Georgia's Uniform Commercial Code (O.C.G.A. § 11–9–312), could have filed a security interest in the cotton sold to Bleckley, they took no such action and made no such filing.

Dunaway had known Lawson for approximately 25 years and was aware, through what he had heard and read, that Mr. Lawson had had financial problems with William Iselin & Company, Inc. ("Iselin"). Dunaway neither investigated those problems nor inquired directly about them with Mr. Lawson. It was a matter of public record that Mr. Lawson's problems had resulted in a lawsuit, a civil suit alleging fraud and seeking monies owed under an accounts receivable agreement, filed in this United States District Court on January 25, 1980, by Iselin against Mr. Lawson, two Lawson corporations, and other individuals. Iselin obtained judgments totaling $9,426,-513.00 against Lawson and his corporations for which *fi. fa.* issued. (Civil Action 80–14, Macon Division).

Allstate is a Virginia corporation engaged, in this case, in the business of factoring accounts receivable. That is, Allstate buys accounts receivable from sellers, such as Bleckley, who have purchased goods from a producer or other seller, such as Dixie, and have sold and shipped those goods to a manufacturer or mill, such as Graniteville. In June of 1983, Allstate and Bleckley agreed (Exhibit A) that Allstate would factor Bleckley's accounts receivable and that Allstate would have a security interest in Bleckley's after acquired accounts receivable. Allstate complied with the relevant filing requirements under Georgia's Uniform Commercial Code.

Lawrence M. Winkler ("Winkler"), Allstate's Second Vice President, formerly em-

ployed as a certified public accountant, had primary responsibility with regard to operations between Allstate and Bleckley. Some five months after the Agreement was signed in June, to assist Winkler and Allstate in overseeing Bleckley's accounts receivable, one of Bleckley's in house bookkeepers, Ms. Betty Snoop ("Snoop"), was placed on Allstate's payroll as a "bonded field employee," under the following terms:[1]

### EMPLOYMENT AGREEMENT WITH BONDED FIELD EMPLOYEES

This Agreement is entered into this 14th day of Nov., 1983, between Betty Snoop ("Employee") and Allstate Financial Corporation, a Virginia Corporation ("Allstate").

1. Allstate hereby employs Employee as a bonded field employee and Employee hereby accepts said employment under the conditions herein recited and attached hereto. In consideration for the compensation set forth and agreed upon between the parties, the Employee hereby holds herself bound by any and all instructions that shall from time to time be furnished to her by Allstate. Attached hereto as Exhibit A, B & C, is a list of preliminary instructions which Employee shall initial and which shall be supplemented and/or modified by Allstate from time to time.

2. In addition to the attached instructions, Employee agrees to accurately advise Allstate as to the location and quantities of cotton subject to invoices held by Allstate. Employee will call the warehouse to determine the existence of cotton and to verify its purchase and shall thereafter verify the shipping of said cotton to the mills, Allstate's obligor.

Employee agrees to diligently and accuratel advise Allstate as to the location and quantities of cotton subject to the invoices held by Allstate; to obtain information in connection therewith from reliable sources; to immediately advise Allstate if she has any reason to disbelieve the accuracy of any information received by her in connection with Allstate's interest, and to otherwise diligently and faith-

fully represent and protect the interests of Allstate. Employee understands and agrees that information provided by her will be relied upon by Allstate.

3. Employee holds herself responsible to Allstate for any loss which Allstate may sustain by reason of any and all unlawful acts on her part or by reason of her failure to fully comply with such instructions.

4. The Employee understands that compensation paid by Allstate will include overtime compensation due, if any, under the Fair Labor Standards Act and amendments thereto. Employee agrees to notify Allstate, in writing, within a reasonable time after receipt of a paycheck, if errors or omissions of any kind should appear on her check. The Employee understands that Allstate, recognizing the need for accurate records as required by the Fair Labor Standards Act and designed to comply with its provisions, requires a report of all hours worked even though they may be in excess of the regular number of hours assigned. Accordingly, Employee agrees to submit time sheets regularly each pay period indicating the actual number of hours worked each day and the total of all hours worked during the week for Allstate.

5. This Agreement, and the employment hereunder, may be terminated by Allstate at any time, for any reason, with or without cause and with or without advance notice.

Employees may terminate this Agreement upon 30 days written notice but no termination noted shall affect any obligation of Employee hereunder except the actual continuance of employment. Employee agrees that employer shall not be liable for any damages sustained by Employee by virtue of said termination.

6. In the event of a breach of this Agreement by Employee, Employee agrees that in addition to such other damages as she may be legally liable to pay, she will reimburse Allstate for all reasonable attorney's fees.

---

1. Snoop, at the time the Agreement was executed, served as Bleckley's corporate secretary and in that capacity attested to Lawson's signature on the Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first hereinabove written.

/s/Betty Snoop
Bonded Field Employee
ALLSTATE FINANCIAL CORPORATION
4660 Kenmore Avenue
Alexandria, Virginia 22304
(703) 370–7550
By (illegible)

Exhibit A—Attached to Employment Agreement with Bonded Field Employees.

Instructions:

1. Daily prepare Purchase summary Exhibit B and purolate to Allstate's offices in Alexandria, Virginia.

2. Daily prepare sales summary Exhibit C, and purolate to Allstate's office in Alexandria, Virginia.

/s/BS

---

In Essence, under this contract ("the Employment Agreement") Snoop was to advise Allstate as to locations and quantities of cotton subject to invoices, to determine the existence of the cotton, verify its purchase, and verify that it was shipped to the mills, Allstate's obligors. Snoop, as an Allstate field employee, was covered by an employee dishonesty policy issued to Allstate by Fidelity and Deposit Company of Maryland.

Snoop's employment with Allstate was unrelated to her duties as Bleckley's bookkeeper. Snoop continued to receive and follow daily instructions from Lawson. Snoop continued in her full duties as one of Bleckley's bookkeepers, carrying out those duties subject to Lawson's daily supervision. These duties included signing checks drawn on Bleckley's Capital Bank account.[2] Snoop continued, pursuant to her bookkeeping responsibilities, to sign checks drawn upon this account until April 6, 1984, the date of the last check signed by Snoop, when, according to Snoop's deposition testi-

mony, Allstate instructed her to stop signing checks drawn by Bleckley. As Bleckley's bookkeeper, Snoop had continuous access to the account checkbook, which kept a running account balance, throughout the term of her part-time employment with Allstate.

Under the Agreement, Bleckley would verbally agree to purchase cotton from sellers such as Dixie; sell the subject cotton to mills such as Dundee Mills; pick up the cotton and at that time deliver a check to the seller; immediately ship the cotton to the purchasing mill and prepare a sale invoice which on its face assigned the amounts payable to Allstate; mail a copy of the assigned invoice to the mill; and, send the original assigned invoice and verified sales reports to Allstate in Virginia.

After Allstate received one or more assigned invoices/accounts receivable and was satisfied of their authenticity, a percentage of the face value of the invoice/account receivable was advanced to Bleckley pursuant to the Agreement. The advances were made either by checks drawn on Allstate's account at the Capital Bank of Washington, D.C. ("Capital Bank") and deposited into Bleckley's independent checking account at Capital Bank or by wire transfer directly to Bleckley's Cochran, Georgia bank account ("the Cochran account"). Allstate advances accounted for about 60% of the credits to Bleckley's Capital Bank account; Bleckley deposited about 40% of the funds from sources independent of Allstate. All of the money deposited by Allstate into the Capital Bank account came from advances on assigned invoices/accounts receivable.

Initially, the amount advanced by Allstate was equal to the total amount shown on the invoice(s)/account(s) receivable less a reserve of the selling price of ten pounds of cotton per bale and a fee to Allstate of one cent per pound of invoiced cotton. The reserve was held as an allowance for possible shortages which might result from differences between the weight of the cotton

---

**2.** The Employment Agreement is silent as to Snoop's bookkeeping responsibility to sign checks drawn on Bleckley's Capital Bank ac-

count; this was part of Snoop's duties in her capacity as a Bleckley employee.

when shipped and when received, possible rejections of shipments, and other potential valid adjustments to the assigned invoice(s). In the fall of 1983, October or November, Allstate decreased the invoice advance amount to 92% of the levels previously agreed upon. The decrease was implemented in response to variances and shortages greater than originally anticipated.

Bleckley used its Capital Bank account as a vehicle for transferring advances on assigned accounts receivable money to itself. As a result, the account regularly showed an overdraft balance. The evidence does not show why Capital Bank permitted Bleckley's account to show a constant overdraft balance. The record does show that Capital Bank rediscounted Bleckley's Capital Bank account to Walter E. Heller & Company ("Heller").

Winkler made monthly inspection visits to Bleckley's Cochran, Georgia office. During these visits, Winkler examined Bleckley's books and records, including Bleckley's Capital Bank account statements, cash receipts, cancelled checks, bank deposits, invoice copies, and disbursements ledger. Allstate, through Winkler, was thus familiar with Bleckley's Capital Bank account and was well aware of its characteristic overdraft status. Allstate, however, exercised neither dominion nor control over Bleckley's Capital Bank account.

Under the Agreement, Allstate and Bleckley originally contemplated assignments of at least $300,000.00 per month. By March of 1984, however, according to Allstate's summary of its losses (Exhibit F), the assigned accounts receivable volume was greatly in excess of the anticipated figure. Advances for March 8 through March 30 alone reached $1,051,166.00.

In late March or early April, 1984, Heller, through their verification system, detected questionable Bleckley accounts receivable assigned to Allstate and rediscounted to Heller. (See Heller internal memos, April 23 and 26, 1984: Exhibits G, H). Heller notified Allstate of these questionable accounts. In response to Heller's notification, on Friday evening, April 13, or Saturday morning, April 14, 1984, Winkler telephoned Snoop at her home. He asked her "if all of the cotton on the receivables was, in fact, paid for." The following Monday, Snoop reported to Winkler that she had checked on the receivables and only then discovered receivables resulting from the sale of cotton for which Bleckley had not made payment.

Winkler immediately (on Monday, April 16, 1984) initiated an audit, which revealed that between March 6 and April 13, 1984, Bleckley had assigned approximately $1,500,000.00 in accounts receivable to Allstate. Approximately $1,300,000.00 of this amount represented invoices for cotton never delivered to the purchasing cotton mills: uncollectible accounts receivable. (See Heller internal memo, April 26, 1984: Exhibit H). Allstate ceased advancing money on Bleckley accounts receivable, the last advance being made on April 13, 1984, for a Bleckley invoice dated April 11, 1984. The checks given Dixie and Blount by Bleckley, dated April 13, 1984, were drawn on Bleckley's Capital Bank account and were returned by Capital Bank without payment because they were drawn on insufficient funds.

Upon learning that the checks were dishonored, Dixie made written demand for the return of the cotton. Blount made no such written return demand at any time. The cotton for which these checks written to Dixie and Blount were drawn, however, had already been resold and delivered by Bleckley to third party mills.

Snoop later admitted that she knew that fictitious or false invoices had been submitted to Allstate; in response to this information, Allstate terminated her employment. (See Deposition of Fishman, p. 27). Allstate later sued Fidelity and Deposit Company of Maryland in the United States District Court for the Northern District of Georgia under the employee dishonesty account. Allstate alleged that Bleckley, through Snoop's dishonest conduct, had caused Allstate to lose more than $750,-000.00; Allstate by settlement recovered $625,000.00.

Lawson was indicted by a grand jury of this court on June 20 and August 2, 1984,

in three indictments charging him with: preparation of fraudulent documents to obtain money; fraud by wire; submission of false and fraudulent statements to the United States Department of Agriculture; disposal of property pledged to the Farmers Home Administration as security for a loan; submission of false statements to the Farmers Home Administration; theft and conversion of property pledged to a United States agency; and, submission of false statements to a United States agency to obtain money. (Criminal Action Nos. 84–19, 84–20, & 84–21, Macon Division). On September 11, 1984, Lawson entered a plea of guilty to three of these charges and was thereafter sentenced.

## CONCLUSIONS OF LAW

■ An experienced, informed seller such as Dixie, who has sold goods in exchange for a check and who then files a security interest in the check under Georgia's Uniform Commercial Code, O.C.G.A. § 11–9–312, will enjoy priority over even subsequent good faith purchasers. Since neither Dixie nor its assignors filed a security interest in the checks around which the present litigation revolves, resolution of the case *sub judice* turns upon whether Allstate, under the present facts, has acted in bad faith. While bad faith alone does not itself give rise to a cause of action under the UCC, Dixie correctly argues that failure to act in good faith will, in some instances, infect the otherwise sterile transactions of a secured party. Dixie alleges that just such an instance is before this court today. Allstate, it is alleged, has acted in bad faith and should not enjoy the protection afforded good faith purchasers under the UCC.

As bad faith alone does not give rise to a cause of action, Dixie must first find an avenue upon which it may proceed toward recovery before this court may even consider the respective arguments with regard to

any alleged deleterious conduct on the part of Allstate.

### I. Reclamation.

Dixie might first seek to proceed under an alleged right of reclamation. Stated simply, Georgia's UCC reclamation provision, O.C.G.A. § 11–2–702(2), provides that if a seller discovers that a buyer has received goods on credit while insolvent, the seller may reclaim the goods upon demand served upon the buyer within ten days of buyer's receipt of the goods. This restatement of the basics of reclamation suggests some of the obstacles which present themselves to sellers wishing to proceed under this provision.

■ The first and often most dispositive barrier to recovery is the strict requirement that demand be made in writing within ten (10) days of the buyer's receipt of the goods. Courts have strictly adhered to the requirement that demand be made within ten days of receipt or else be lost. *In re Samuels & Co., Inc.*, 526 F.2d 1238, 1245 (5th Cir.1976) (*en banc*) *cert. den. sub nom. Stowers v. Mahon*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1977) ("The Code's ten day requirement is an absolute requirement. There is no exception in the Code Sections or Comments, express or implied, to the statutory period."). Under the present facts, Dixie would be precluded from asserting the rights assigned Dixie by Blount, who completely failed to make any written demand upon anyone, under a right of reclamation.[3] Dixie apparently complied with the ten day requirement when it made a written demand for the return of the goods.

■ Most troubling to Dixie with regard to its right of reclamation is the fact that the subject goods (the cotton) had already been sold and shipped to third party purchasers. Reclamation of goods is primarily a right between a seller and a purchaser; a right subject to the paramount

---

**3.** The court is well aware of the exception, set out in O.C.G.A. § 11–2–702, to the ten day requirement where a misrepresentation of solvency has been made to the particular seller in writing within three months before delivery of the goods. In the case *sub judice* it appears that the only representations made by anyone with regard to Lawson were news stories and rumors of Lawson's impending financial demise. Finally, Blount should not be heard to rely upon the checks written by Bleckley themselves as "written misrepresentations of solvency." *See Theo. Hamm Brewing Co. v. First Trust & Savings Bank of Kankakee*, 103 Ill.App.2d 190, 242 N.E.2d 911 (1968) (checks themselves do not amount to representations of solvency).

rights of third party good faith purchasers. *B & P Lumber Co. v. First National Bank,* 147 Ga.App. 762, 250 S.E.2d 505 (1978). In essence, then, a seller such as Dixie, who has foregone the available option of perfecting its own interests under the UCC, enjoys a remedy under O.C.G.A. § 11–2–702, only to the extent that the provision grants such a seller a right to reclaim **the goods** from the buyer or purchasers who have proceeded other than in good faith; the UCC creates no reclamation rights which extend to **proceeds.** *Id.,* 250 S.E.2d at 508 (emphasis added). It is undisputed in the case *sub judice* that the goods, cotton, have long since been processed. Therefore, even if Dixie succeeded in establishing bad faith on the part of Allstate, any arguably available reclamation rights would not extend to the proceeds of a sale of the cotton, even if such a sale was made in bad faith.[4]

## II. Seller v. Secured Purchaser/Dixie v. Allstate.[5]

Dixie's claim, however, survives to the extent that O.C.G.A. § 11–2–401 applies to the present facts. In *Samuels,* the court specifically found that while the UCC's reclamation provision does not reach the proceeds of a sale of goods otherwise subject to reclamation, an aggrieved seller may yet under Article Two have an interest superior to a subsequent purchaser of the goods. *Samuels,* 526 F.2d at 1246–47.

Judge Godbold, writing for the *en banc* majority, after "a meticulous and dispassionate reading of Articles Two and Nine," concluded that "[t]he Code's overall plan ... typically favors good faith purchasers, and typically encourages notice filing of nonpossessory security interests." *Id.* at 1241. Consistent with this "overall plan," the Code recognizes the power of a defaulting buyer to pass good title to a good faith

purchaser even though the transfer is wrongful as against the original seller.[6] "The buyer is granted the **power** to transfer good title despite the fact that under § 2.507 [See O.C.G.A. § 11–2–507] he lacks the **right** to do so." *Id.* at 1242 (emphasis in original).

■■■ The claim of a seller such as Dixie that its interest is superior to a party such as Allstate is traceable to principles that predate the promulgation and adoption of the UCC. At common law, a seller for cash implicitly reserved the incidents of ownership or title to the goods until payment was made in full. Failing payment, the seller could institute an action in replevin to regain possession of the goods. Furthermore, because a buyer did not obtain title to the goods until payment was made to the seller in full, an aggrieved seller could even reclaim goods sold by an intermediary who would today qualify as a bona fide purchaser; a defaulting buyer was unable to pass title to any third party.

In *Samuels,* Judge Godbold reasoned that the UCC specifically limits a seller's ability to reserve title once possession is voluntarily surrendered to a buyer. *Id.* at 1246 ("Any retention or reservation by the seller of the title in goods shipped or delivered to the buyer is limited in effect to a security interest") (citations omitted). The interest of a seller upon delivery prior to payment in full is, then, a security interest subject to Article Nine. *Id.* at 1247.[7] In essence, a buyer holds the power to transfer good title "even though ... the delivery was in exchange for a check which is later dishonored," so long as the goods are transferred to "a good faith purchaser for value." *Matter of Smith,* 51 B.R. 904, 909 (Bkrtcy.1985) (citing O.C.G.A.

---

4. Even if, for the sake of argument, reclamation rights were to extend to proceeds, a result in favor of Dixie would still be contingent upon an analysis of the alleged bad faith of Allstate. This analysis is provided, *infra.*

5. An informative academic treatment of the type of conflict before the court has been written by Kamp & Solove in *"Seller v. Secured Party: Searching for an Intangible Something,"* 28 Mercer L.Rev. 625 (1978).

6. This arguably harsh result does not obtain under the Code against seller's who perfect their interest upon receipt of a buyer's check.

7. Judge Godbold recognized that while many of the interests governed by Article Nine are consensual, an interest such as that of an unpaid seller may arise by operation of law and nonetheless be subject to Article Nine treatment. *Id.*

§ 11–2–403(1)(b) (Michie 1982)); *Accord Samuels,* 526 F.2d at 1242.

Resolution of the dispute between an aggrieved seller (such as Dixie) and an Article Nine secured purchaser (such as Allstate) is, then, dependent upon analysis of the validity of Article Nine purchaser's interest. If the Article Nine purchaser's interest can be characterized as a good faith purchaser's perfected security interest, that interest will be prior under Article Two, O.C.G.A. § 11–2–403(1)(a), to the aggrieved seller's interest.[8] While this analysis appears to, and arguably does, favor the Article Nine purchaser, it nonetheless leaves open the possibility of an unpaid seller's unperfected security interest prevailing over a purchaser's otherwise superior perfected Article Nine interest.

The touchstone: Good Faith. Should the court determine that the secured party (here Allstate) has in fact acted in bad faith, the aggrieved seller (here Dixie) could assert a superior, though unperfected, interest.

## GOOD FAITH

 It is first important to note that, under the present facts, any knowledge of outstanding third party claims, while relevant in some bona fide purchaser contexts, is not relevant to the analysis of Allstate's Article Two good faith purchaser's status. As one court has noted:

> The assumed existence of third party claims is the principal reason for perfecting nonpossessory article nine security interests. The basis for such interests certainly cannot establish their invalidity.

*Genesee Merchants Bank & Trust Co. v. Tucker Motor Sales,* 143 Mich.App. 339, 372 N.W.2d 546 (1985). The Article Two definition requires only honesty in fact, reasonable commercial behavior, and fair dealing.

 Neither does Allstate's knowledge of the characteristically overdrawn status of Bleckley's Capital Bank account compromise its good faith status. Nothing in the Code requires a party such as Allstate to avoid or limit purchases of accounts receivable from a buyer such as Bleckley in order to protect the interests of unsecured sellers such as Dixie. So long as Allstate never exercised any special control over Bleckley's Capital Bank account, its knowledge of the typically overdrawn status of the account is not grounds to question Allstate's honesty in fact or fair dealing. Allstate exercised no such control over Bleckley's independent Capital Bank account. Allstate did not arrange for Capital Bank to honor Bleckley's overdrafts; nor did Allstate guarantee to pay Bleckley's overdrafts. This was not an arrangement in which Allstate supplied money as needed by Bleckley to cover checks drafted by Bleckley on insufficient funds. Allstate exercised no independent control over Bleckley's Capital Bank account, but merely deposited funds into the account in response to submitted invoices.[9]

 Similarly, Allstate's decision, upon discovery of the fraud being perpetuated by Bleckley through Snoop and others, to cease making advances on Bleckley invoices cannot be seen as bad faith. *See Samuels,* 526 F.2d at 1244 (nothing in the Code mandates that a secured party need continue to finance a "doomed enterprise"). Absent some written misrepresentation of Bleckley's solvency by Allstate, no argument can be made that Allstate's conduct either led Dixie to mistake the vitality of Bleckley's operations or amounted to Allstate's endorsement of Dixie's decision to

---

**8.** Analysis of whether the Article Nine purchaser has acted in good faith is properly governed by Article Two's detailed definition which requires honesty in fact, reasonable commercial behavior, and fair dealing.

**9.** The court notes Dixie's argument that Snoop, as one empowered to sign checks for Bleckley, acted as an agent for Allstate with control over the funds in Bleckley's Capital Bank account. The court addresses arguments with regard to

the propriety of attributing the acts of Snoop to Allstate *infra.* Initially, however, the court would point out that Snoop's duties with regard to Bleckley's Capital Bank account, predated the Employment Agreement, were not addressed under the Employment Agreement as duties of Allstate's "bonded field employee," and continued after the execution of the Employment Agreement only pursuant to Snoop's status as Bleckley's bookkeeper.

conduct business with Bleckley. Allstate neither owed nor undertook any duty to notify Dixie of the character of Bleckley's independent Capital Bank account.

This court, previously under a misapprehension of the facts with regard to: (a) the amount of control exercised by Allstate over the daily transactions at Bleckley's Cochran, Georgia facility; (b) the extent to which Allstate influenced certain purchasing and payment decisions at Bleckley; and, (c) the degree of control which Allstate exerted over the balance in Bleckley's Capital Bank account, previously found the case *sub judice* to be similar in composition to those cases which have questioned a financier's good faith status based upon the amount of continuous daily control exercised by those financiers over the accounts of delinquent, insolvent buyers. These cases predicated their analyses upon such control and suspicious circumstances, not merely upon a party's knowledge of deficits in the delinquent buyer's bank account. *See, e.g., Central Bank of Alabama v. American Charms, Inc.,* 149 Ga. App. 218, 253 S.E.2d 857, 858 (1979) (court denies summary judgment motion not because defendant was aware of previous deficits in account, but because of concern with regard to defendant bank's decision to wait for eighteen days before dishonoring the delinquent buyer's check). Upon closer re-evaluation of the facts, Allstate's actual involvement in operations at Bleckley can be labelled nothing other than reasonable business conduct carried out to protect Allstate's interests under the Agreement.

■ Merely positioning the statements that Snoop was monitoring Bleckley's transactions on behalf of Allstate and that Snoop signed Bleckley's bad checks next to one another does not create a relationship between the statements themselves or between the duties and responsibilities underlying those statements. The facts and documentary evidence in the case *sub judice* do not support Dixie's arguments calling on this court to attribute to Allstate the fraud engaged in by their disloyal parttime agent, Snoop. Snoop's monitoring responsibilities under the Employment Agreement extended only to the **validity of invoices/accounts receivable** submitted by

**Bleckley to Allstate.** (See Employment Agreement ¶ 2: "... [Snoop] agrees to diligently and accurately advise Allstate as to the location and quantities of cotton subject to the invoices held by Allstate").

■ While this court may attribute to Allstate the **knowledge** obtained by its corporate employees, *see Steere Tank Lines, Inc. v. United States,* 330 F.2d 719, 722 (5th Cir.1964), including employees like Snoop, the **acts** of such an employee are attributable to a corporation only to the extent that such an employee was operating within the scope of her employment. *See United States v. Bank of New England, N.A.,* 821 F.2d 844, 856 (1st Cir.1987) (emphasis added). A corporation such as Allstate is responsible for the acts of its employees committed **within the scope of their employment.** *See United States v. Richmond,* 700 F.2d 1183, 1195, n. 7 (8th Cir.1983) (emphasis added); *see also Jones v. Dixie Ohio Express, Inc.,* 116 Ga.App. 155, 156 S.E.2d 388 (1967) ("The test is not that the act of the servant was done during the existence of the employment, that is to say, during the time covered by the employment, but whether it is done in the prosecution of the master's business ...") (citations omitted); *Accord Wittig v. Spa Lady, Inc. of Marietta,* 182 Ga.App. 689, 356 S.E.2d 665 (1987). To extend Allstate's responsibility any further under the present facts would be inconsistent with agency principles.

Allstate's knowledge of the characteristically overdrawn status of Bleckley's Capital Bank account is undisputed. Snoop's knowledge in this regard is cumulative and does nothing to change Allstate's good faith purchaser status. Any attempt to connect the fact that Snoop, on behalf of Bleckley, signed checks which were knowingly drawn upon insufficient funds with her role as Allstate's "bonded field employee" ignores the limited scope of Snoop's responsibilities as Allstate's agent under the Employment Agreement. Snoop's authorization to sign Bleckley checks fell under her responsibilities as a Bleckley employee; nowhere in the Employment Agreement is Snoop, as Allstate's "bonded field employee," authorized to sign checks

drawn on Bleckley's Capital Bank account. Any control exercised by Snoop over the funds in Bleckley's Capital Bank account was wholly unrelated to her agency relationship with Allstate.

Upon first discovery of the fictitious and fraudulent invoices, a discovery made pursuant to Allstate's audit, Winkler terminated Allstate's relationship with Bleckley. To find that Snoop's fraudulent activities or her authorization that Bleckley checks drawn on insufficient funds somehow amount to misrepresentation by Allstate would be to ignore the facts in this case and would amount to nothing more than an effort to tap a liquid source of funds without regard to actual fault.

The essence of fraud and misrepresentation is reliance. Upon the present facts, Dixie cannot be heard to claim that it relied upon any representation made by anyone acting in their capacity as Allstate's agent. In fact, up until the checks, which are the subject of the present litigation, were dishonored by Capital Bank, Dixie and Allstate were at best merely aware of one another's existence as parties transacting business with Bleckley. It is precisely these kinds of multiple party transactions, in which the involved parties rarely, if ever, deal directly with one another, that make utilization of the UCC's available protective filings crucial. Failure to utilize to full potential all the protection that the UCC affords leaves unsecured parties' interests inferior to those of parties who wisely follow UCC directives. Allstate secured its position not through fraud or misrepresentation, but through the detached act of filing.

All that can be said in reference to the UCC with regard to Allstate's conduct is that Allstate followed UCC directives by complying with the UCC's filing requirements. When Allstate, through Winkler, learned of the fraud being perpetuated by Bleckley and Snoop, Allstate immediately ceased their business relationship with Bleckley, Lawson, and Snoop. This cannot be said to mar Allstate's good faith status; Dixie mistakes for bad faith what is best termed commercial vigilance.

There remain no factual disputes as to the actual control exercised by Allstate or Snoop, in her capacity as Allstate's "bonded field employee," over Bleckley's Capital Bank account. Allstate's actions with respect to Dixie or any other involved interest can be characterized as nothing other than honesty in fact, good faith under Article Two. Allstate's interest, as that of a good faith purchaser of Bleckley's accounts receivable, is, therefore, superior to those asserted by Dixie and Blount as unsecured aggrieved sellers. Accordingly, Allstate's motion for summary judgment is hereby GRANTED.

SO ORDERED.

## EXHIBIT A

### SECURITY AGREEMENT AND GUARANTY

This Agreement is made _____June_____ , 19 __83____ between ALLSTATE FINANCIAL CORPO-RATION, hereafter called Allstate, and _Bleckley Lumber Company, Inc.__ hereafter called Borrower, and _William Carlton Lawson_____

_____ and hereafter called (jointly and severally) Guarantor.

 1. *Purchase of accounts.* The Borrower will from time to time offer to sell to Allstate, and Allstate will purchase from Borrower, such open accounts receivable, book debts, notes, drafts, acceptances, contracts, and choses in action, hereinafter called accounts, arising in the ordinary course of business of Borrower, as are acceptable to Allstate. Allstate will advance to Borrower at the time of the purchase of accounts a percentage of the face value thereof; and the remainder, hereinafter called the reserve, (less any charges, discounts or deductions and plus any overpayments), will be paid to Borrower immediately upon payment in full of any such accounts to Allstate by the parties indebted thereon, hereinafter referred to as the debtors. No such payments need be made by Allstate in respect of any accounts purchased or assigned hereunder, if Borrower is in default in the performance of any provisions of this agreement with respect to any accounts whatsoever.

 2. *Charges.* Borrower shall pay the cost of filing any financing statements or other public records required, in Allstate's discretion, to perfect a security interest in the collateral (described below) offered by Borrower as security for the performance by Borrower (and the debtors of the Borrower) of Borrower's obligations hereunder. In addition, Allstate shall deduct from the reserve paid to Borrower the charges shown on Schedule A attached hereto, as "discounts".

 3. *Representations and covenants.* The Borrower represents, warrants, and covenants as follows: (a) contemporaneously with the purchase of accounts pursuant to this agreement, Borrower will execute a schedule of accounts, in a form approved by Allstate, vesting in Allstate all the Borrower's right, title, and inter-

## EXHIBIT A—Continued

est in and to said accounts, with any securities or guaranties thereon, and in and to the property evidenced thereby, including the right of stoppage in transit; (b) Borrower will make proper entries upon its books, disclosing the absolute sale of accounts to Allstate; (c) every account will be bona fide, will be a certain undisputed claim for the amount set forth in the schedule of accounts, will represent a sale and delivery of personal property sold, or work and labor done by Borrower, will not be subject to any setoff or counterclaim, and will not be contingent upon the fulfillment of any contract or condition whatsoever, and Allstate may verify all such accounts or any portion thereof; (d) each debtor named in each account will be solvent, and will remain so until the maturity thereof, and each account will be paid in full on or before the date shown on its due date on the schedule of accounts, and if not so paid Borrower will upon demand promptly pay any amount represented to be owing thereon to Allstate; (e) if any debtor objects to the quality or quantity of property sold or work and labor done by Borrower, or rejects, returns, or fails or refuses to accept or receive any property represented by any account, of if any such property is rerouted or reconsigned, then the Borrower will forthwith pay to Allstate the amount represented to be owing on such account, and in the case of any property returned to Borrower, Borrower will hold such property in trust for Allstate and subject to its order, until payment is made therefor by Borrower to Allstate; (f) if any allowance or credit on any account is given by Borrower, then Borrower shall pay the amount thereof immediately to Allstate; (g) Borrower, upon demand, will open all mail only in the presence of a representative of Allstate, who may take therefrom any remittances on accounts sold to Borrower; (h) Allstate may endorse the name of Borrower upon any such remittances, if payable to Borrower, and may sign and endorse the name of Borrower on any invoice, freight bill, bill of lading, storage receipt, warehouse receipt, or any other instrument or document in respect of any account, and may sign the name of Borrower on any notices Allstate may give to debtors; (i) Allstate may, from time to time, enter Borrower's premises to inspect, check, make copies of or extracts from the books, accounts, orders, and original correspondence relating to accounts, and Borrower will make available its books, records and files to Allstate at any time for such purposes; (j) Borrower may hold for purchase or as security any accounts, property, securities, guaranties, or monies of Borrower, which may at any time be assigned to, or delivered to, or come into the possession of Borrower, and may apply these or the proceeds thereof to the payment of any amounts which at any time then are or thereafter are or might be owing to Allstate by Borrower; (k) Borrower will not sell, grant a security interest in, or assign any of its accounts elsewhere without giving 30 days' written notice to Allstate of its intention to do so; (l) if any debtor suspends business, requests a general extension of time within which to pay its debts, or makes an assignment for the benefit of creditors, or if a petition in bankruptcy, or in equity for receivership, or for reorganization under the Bankruptcy Act or any amendment thereof is filed by or against any debtor, or a creditors' committee is named for any debtor, or in the event of the occurrence of any act whatsoever amounting to a business failure by any debtor, then in such event Borrower will immediately pay to Allstate the amount represented to be owing by such debtor on any account; (m) if Borrower fails to perform promptly or violates any of the promises or obligations herein contained, then Borrower shall pay Allstate all attorney's fees, court costs, and all other expenses which may be expended or incurred by Allstate to obtain or enforce payment of any account, either against the debtor, Borrower, or any guarantors, or expended or incurred in the prosecution of any action against Borrower or any guarantors concerning any matter growing out of or connected with the subject matter of this agreement and accounts purchased herein; (n) Borrower will execute and deliver to Allstate any and all instruments or documents, and do any and all things, necessary or convenient to carry into effect the provisions of this agreement, and to facilitate the collection of any accounts; and (o) Allstate shall have the right to notify the U.S. Postal Service authorities to change the address for the delivery of mail addressed to Borrower to such address as Allstate may designate.

4. *Collection of accounts.* Borrower hereby authorizes Allstate to collect accounts from the debtors. Borrower agrees that it will transmit and deliver to Allstate at Alexandria, Virginia, on the dates of receipt thereof, all original checks, notes, drafts, acceptances, or other evidences or forms of payment received by Borrower in payment of, or on account of, any accounts sold to Allstate, and Allstate shall accept at par, subject to payment, all such remittances. Allstate may notify any debtor or debtors of the assignment of accounts by Borrower, and may collect such accounts directly from any such debtor, and Borrower does hereby constitute and appoint Allstate its attorney in fact irrevocably for it and in its name, and at the cost and expense of Borrower, to demand, collect, compromise, sue for, and institute and complete any action or proceedings whatsoever for the collection of any monies due upon any accounts.

5. *Lien and Security Interest; Assignment of Receivables*

a. To secure the payment of its obligations to Allstate, Borrower grants to Allstate a continuing general lien and security interest in all receivables and in all of Borrower's rights, title and interests in other accounts, security agreements, notes, bills, acceptances, installment paper, certificates of deposit, tax refunds, insurance proceeds, conditional sale or lease contracts, chattel mortgages or deeds of trust, general intangibles, and contract rights, and all other hypothecations, and promises or duties to pay money, now or hereafter owned or acquired by Borrower, and all proceeds and collections thereof, all guaranties and other security therefor, and all right, title, and interest of Borrower in All present and hereafter created Accounts Receivable, Accounts and contract rights, general intangibles, Certificates of ~~Deposit and the interest of debtor in any returned, repossessed or unshipped~~ goods, together with all debtors books of accounts, ledger cards and records; all after acquired computer programs and systems owned or operated in connection ~~therewith; all of the above securing present and future advances.~~

(all of which is sometimes hereinafter referred to collectively as "Collateral"). Allstate shall have the right to use the name of Borrower in enforcing Allstate's rights hereunder.

b. Borrower shall pledge, assign and deliver the Collateral to Allstate at its office in Alexandria, Virginia, or such other places as Allstate may designate, together with schedules executed by Borrower, listing the Collateral and fully and correctly specifying in adequate detail the aggregate unmatured, unpaid face amount of each item of account and the amount of the deferred installments thereof falling due each month. The schedules shall be of form and tenor satisfactory to Allstate. Each payment of money to Borrower, and each assignment and delivery of Collateral pursuant to such payment covered by each schedule shall constitute and be a single transaction, separate from and independent of every other schedule, but the provisions of this agreement shall apply to each and every such transaction. Any representations, warranties, guaranties or other undertakings of Borrower contained in said schedules or endorsed on any Collateral or otherwise entered into

ALLSTATE FINANCIAL CORPORATION
4660 Kenmore Avenue, Suite 701
Alexandria, Virginia 22304
Rosalie J. Bolen

Prepared by:

by or on behalf of Borrower by any of its officers or agents shall be binding on Borrower and shall not limit any of Borrower's warranties, guaranties, or other undertakings contained in this agreement, but all such warranties, guaranties and undertakings and all rights and remedies of Allstate hereunder or under said schedules, endorsement or other undertakings shall be cumulative and none is exclusive. Borrower agrees that Allstate may from time to time verify the validity, amount and other matters relating to the Collateral by means of mail, telephone or otherwise in the name of Borrower, Allstate or such other name as Allstate may choose.

 c. Failure to include any item of Collateral in any schedule, or failure to deliver physical possession of any instruments, documents, or writings in respect of any Collateral shall not invalidate Allstate's lien and security interest therein, except to the extent that possession may be required by applicable law for the perfection of said lien or security interest.

 d. Failure of Allstate to demand or require Borrower to include any items of Collateral in any schedule, to execute any schedule, to assign and deliver any schedule, or to deliver physical possession of any instruments, documents, or writings related to the Collateral shall not relieve Borrower of its duty to do so.

 e. After the occurrence of any event of default, as defined in Paragraph 6 hereof, and until such default is either cured or waived by Allstate in writing, Allstate may, without prior notice to Borrower, apply all or any part of the proceeds of any advance or advances thereafter made upon any schedule or schedules to reduction of Borrower's loan account or payment of any Borrower's obligations.

 f. All purchases and advances by Allstate to Borrower under this agreement and under all other future agreements constitute one transaction, and all indebtedness and obligations of Borrower to Allstate under this and under all other agreements, present and future, constitute one general obligation secured by collateral and security held and to be held by Allstate hereunder and by virtue of all other agreements between Borrower and Allstate, now and hereafter existing. It is distinctly understood and agreed that all of the rights of Allstate contained in this agreement shall likewise apply insofar as applicable to any modification of or supplement to this agreement and to any other agreements, present and future, between Allstate and Borrower.

 g. Without the written consent of Allstate, Borrower will not allow any Financing Statement or Notice of Assignment of Accounts Receivable other than those executed or filed by Borrower or Allstate as a result of purchases or advances hereunder to be on file in any public office covering any of Borrower's accounts receivable, proceeds thereof or other matters subject to the security interest granted to Allstate in this Paragraph 5 of this agreement.

 6. *Default.* If Borrower defaults in the performance of any provision of this agreement, suspends business voluntarily or involuntarily, makes an assignment for the benefit of creditors, or if a receiver is appointed for the property of Borrower, or if a petition in bankruptcy, or in equity for receivership, or for reorganization under the Bankruptcy Act or any amendment thereof, is filed by or against Borrower, or a creditors' committee is named for Borrower, or in the event of occurrence of any act whatsoever amounting to a business failure by Borrower, or if there is any change in officers, directors or stockholders of Borrower not occasioned by death, Allstate shall have all the rights and remedies provided in this agreement and in the Uniform Commercial Code in force in the State of Borrower's chief place of business at the date of this agreement and, in conjunction with or addition to those rights and remedies, Borrower will on demand repurchase from Allstate all the outstanding and unpaid accounts, and will pay Allstate therefor the aggregate principal amount owing thereon, plus charges accrued thereon, attorneys' fees, interest at the prime rate in effect on date of default at the McLean Bank, McLean, Virginia, all expenses of collection, and other charges or expenses paid or incurred by Allstate in respect of accounts, debtors, Borrower, or guarantors, or in the prosecution or defense of any actions in respect of this agreement, or accounts purchased hereunder, less any amounts payable by Allstate to Borrower hereunder; and upon failure so to do, Allstate may liquidate accounts by sale at public or private sale, on ten days' notice by registered mail to Borrower, or on such notice as may be required by law, at which sale Allstate may bid for and purchase accounts free from any right or equity of redemption of Borrower, and the net proceeds of such sale shall be applied against the repurchase price, and the Borrower shall be entitled to any surplus, or shall pay any deficiency.

 7. *Modifications.* Allstate may, without notice to Borrower, grant extensions to, or adjust claims, or make compromises, compositions, or settlements with debtors with respect to any accounts, or securities or insurance applying thereon, without affecting the liability of Borrower hereunder.

 8. *Waiver.* Borrower waives notice of nonpayment, protest, and demand, or notice of protest and demand, of any accounts, or of any securities or instruments relating to any such accounts. The waiver by Allstate of any breach of this agreement, or any warranty or guaranty herein, shall not be construed as a waiver of any subsequent breach. The failure to exercise any right hereunder by Allstate shall not operate as a waiver of such right. All rights and remedies herein are cumulative and not alternative.

 9. *Guaranty.*

 (a) Guarantor is a party to this agreement for the purpose of inducing Allstate to advance monies to or purchase accounts from Borrower.

 (b) Guarantor hereby guarantees the prompt and complete performance by Borrower of all the covenants and conditions of this Security Agreement, and payment of all damages, costs and expeses that by virtue of this agreement might be recoverable by Allstate from Borrower.

 (c) This guaranty shall continue until all terms of this Security Agreement have been performed by Borrower or discharged by Allstate.

 (d) Guarantor's obligations hereunder are derived from Borrower and Guarantor shall be entitled to, and shall not assert any defense to which Borrower is not entitled.

 (e) This guaranty shall extend to all present and future advances or purchases by Allstate to or from Borrower.

 (f) Allstate shall not be required to exhaust its remedies against Borrower before proceeding against Guarantor; but, Allstate may, at its discretion, proceed against either or both in any order it chooses.

 (g) Any indebtedness of Borrower now or hereafter held by Guarantor is hereby subordinated to the indebtedness of Borrower to Allstate.

 (h) This guaranty shall not be discharged or in any way affected by the death of Guarantor.

 10. *Benefit.* This agreement shall be binding upon and inure to the benefit of the parties, their legal representatives, successors, and assigns.

 11. *Place of business.* Borrower warrants and represents that its only places of business are those set forth below and that Allstate will be notified promptly of any change of location of any place of business or recordkeeping or the addition or any new place of business or recordkeeping. Borrower further warrants and represents that the only office where it keeps records concerning the accounts herein referred to is its chief place of business set forth below.

## EXHIBIT A—Continued

12. *Assignment.* This agreement may be assigned by Allstate without notice to Borrower. However, neither this Security Agreement not the Guaranty herein may be assigned by Borrower or Guarantor without written consent of Allstate.

13. *Amendment.* This agreement contains the entire agreement of the parties hereto, and neither shall be bound by anything not expressed in writing.

14. *Construction; Consent to Service of Process.* The validity, interpretation and effect of this agreement and guaranty shall be governed by the laws of the State of _Virginia_. Borrower hereby consents to the jurisdiction of all courts in Virginia and hereby appoints Allan W. Farlow, Esq., whose address is 8501 Stonewall Drive, Vienna, Virginia as Borrower's Agent for Service of Process. Said appointment by Borrower is for the sole purpose of acceptance of service of process and no other; and Borrower shall pay all costs and expenses incurred by said Agent in notifying Borrower of the service of any process. Borrower and Guarantor hereby authorize said Agent to send notices to each of them via certified mail, return receipt requested, at Borrower's chief place of business listed below; PROVIDED THAT, if Borrower's chief place of business AND Guarantor's place(s) of residence are in the State of Virginia, Maryland or the District of Columbia, the provisions of this entire paragraph shall not apply to this agreement.

15. *Power of Attorney—Borrower.* Borrower hereby appoints and authorizes Allstate as its attorney-in-fact to endorse on its behalf Borrower's name on checks, or other forms of remittance received where such endorsement may be required to effect collections, or on and as to any forms of collateral, such as letters of credit, deeds of trust, notes, deeds, etc., where said collateral must be looked to by Allstate for collection of Borrower's debts hereunder. This power shall permit Allstate to deal generally in all respects, without restriction, in and with any of the property that constitutes either the accounts secured hereunder, or the collateral described herein. This power of attorney shall be deemed to be coupled with an interest and shall not be revoked and cannot be revoked except with the prior written consent of Allstate.

16. *Power of Attorney—Guarantor.* Guarantor hereby appoints Allstate as his/her attorney-in-fact to deal generally in all respects, without restriction, in and with all of the property owned by Guarantor that forms part or all of the accounts secured hereunder or the collateral described herein. This power of attorney shall permit Allstate to deal with said property as if said property were owned by Allstate. This power of attorney shall be deemed to be coupled with an interest and shall not be revoked and cannot be revoked except with the prior written consent of Allstate.

17. *Term.* This agreement shall begin on the date first written above and continue in full force and effect for a period of one (1) year.

18. *Continuing Purchases.* The parties contemplate a continuous course of purchase of accounts by Allstate and concurrent advances to Borrower during the term of this agreement. Borrower shall offer to Allstate accounts in the face amount of at least $ _300,000.00_ per month. Borrower warrants that it shall not enter into any other factoring or similar agreement with any other entity or person during the term of this agreement without the prior written consent of Allstate. In the event Borrower shall pay to Allstate the sum of $ _5,000.00_ as liquidated damages for said breach.

19. *Continuing Effect.* The provisions of this agreement and guaranty shall apply to all present and future transactions whereby Allstate advances monies to Borrower or whereby Borrower sells or assigns accounts to Allstate.

In witness whereof Borrower has executed this agreement, and Allstate has noted its acceptance by its authorized employee.

Corporate Seal

Attest:

_____
Secretary
Betty Snoop

Bleckley Lumber Company, Inc.

By _William Carlton Lawson_
William Carlton Lawson, President

_William Carlton Lawson_
Individually
William Carlton Lawson

_____
Individually

112 Second Street, Cochran, GA 31401
Chief Place of Business

_____
Other Place of Business

1558

## ALLSTATE FINANCIAL CORPORATION

4660 KENMORE AVENUE
ALEXANDRIA, VIRGINIA 22304

P.O. BOX 3009
ALEXANDRIA, VIRGINIA 22302
(703) 370-7550

January 19, 1984

Graniteville Mills
P. O. Box 419
Augusta, Georgia 30903
Attn: Accounts Payable

Re: Assignment of· Account (s) of:
Bleckley Lumber Company, Inc.
d/b/a Bleckley Cotton Company

Gentlemen:

Please be advised that all amounts payable by you to our Client,Bleckley Lumber Company
Inc d/b/a Bleckley Cotton Co., have been assigned to Allstate. This assignment
merely reflects the fact that we are advancing monies to our client on a revolving
line of credit arrangement with the representation, and the expectation, that you
will be making payments on this account in the near future, and to advise you that
all of your payments will now be made to Allstate until notified by Allstate.

The credit agreement with our client is on the basis of its financial strength
and its creditworthiness; and no inferences to the contrary should be made.

Allstate Financial Corporation is a financial institution that lends money
for short terms and accepts accounts receivable, like yours, as collateral. Our
activities are regulated and protected by the Uniform Commercial Code in force in
your state. Section 9-318 of the Code authorizes you to make payments directly
to Allstate once you have received this letter. That same section makes illegal
and invalid any agreement between you and our client that prohibits assignment
of this account.

Our client has agreed to this assignment in a separate contract with Allstate;
and, to indicate its willingness to assign your account, has signed below.
If you have any questions, please telephone.

Very truly yours,

Eladio Ortiz
General Manager

Bleckley Lumber Company,Inc. d/b/a Bleckley Cotton Company

By_____

EXHIBIT C

# ALLSTATE FINANCIAL CORPORATION

4660 KENMORE AVENUE
ALEXANDRIA, VIRGINIA 22204

P.O. BOX 3009
ALEXANDRIA, VIRGINIA 22302
(703) 370-7550

EMPLOYMENT AGREEMENT WITH BONDED FIELD EMPLOYEES

This Agreement is entered into this 14th day of Nov.,
198 3, between Betty Snoop ("Employee") and Allstate Financial Corporation,
a Virginia Corporation ("Allstate").

1. Allstate hereby employs Employee as a bonded field employee and,
Employee hereby accepts said employment under the conditions herein recited
and attached hereto. In consideration for the compensation set forth and
agreed upon between the parties, the Employee hereby holds herself bound
by any and all instructions that shall from time to time be furnished to
her by Allstate. Attached hereto as Exhibit A,B & C, is a list of preliminary
instructions which Employee shall initial and which shall be supplemented
and/or modified by Allstate from time to time.

2. In addition to the attached instructions, Employee agrees to accur-
ately advise Allstate as to the location and quantities of cotton subject
to invoices held by Allstate. Employee will call the warehouse to determine
the existence of cotton and to verify its purchase and shall thereafter
verify the shipping of said cotton to the mills, Allstate's obligor.

Employee agrees to diligently and accurately advise Allstate as to the
location and quantities of cotton subject to the invoices held by Allstate;
to obtain information in connection therewith from reliable sources; to im-
mediately advise Allstate if she has any reason to disbelieve the accuracy
of any information received by her in connection with Allstate's interest,

DEFENDANT'S
EXHIBIT

and to otherwise diligently and faithfully represent and protect the interests of Allstate. Employee understands and agrees that information provided by her will be relied upon by Allstate.

3. Employee holds herself responsible to Allstate for any loss which Allstate may sustain by reason of any and all unlawful acts on her part or by reason of her failure to fully comply with such instructions.

4. The Employee understands that compensation paid by Allstate will include overtime compensation due, if any, under the Fair Labor Standards Act and amendments thereto. Employee agrees to notify Allstate, in writing, within a reasonable time after receipt of a paycheck, if errors or omissions of any kind should appear on her check. The Employee understands that Allstate, recognizing the need for accurate records as required by the Fair Labor Standards Act and designed to comply with its provisions, requires a report of all hours worked even though they may be in excess of the regular number of hours assigned. Accordingly, Employee agrees to submit time sheets regularly each pay period indicating the actual number of hours worked each day and the total of all hours worked during the week for Allstate.

5. This Agreement, and the employment hereunder, may be terminated by Allstate at any time, for any reason, with or without cause and with or without advance notice.

Employee may terminate this Agreement upon 30 days written notice but no termination noted shall affect any obligation of Employee hereunder except the actual continuance of employment. Employee agrees that employer shall not be liable for any damages sustained by Employee by virtue of said termination.

EXHIBIT C—Continued

-3-

6. In the event of a breach of this Agreement by Employee, Employee agrees that in addition to such other damages as she may be legally liable to pay, she will reimburse Allstate for all reasonable attorney's fees.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first hereinabove written.

_____
Bonded Field Employee

ALLSTATE FINANCIAL CORPORATION
4660 Kenmore Avenue
Alexandria, Virginia 22304
(703) 370-7550

By _____

EXHIBIT C—Continued

Exhibit A – Attached to Employment Agreement with Bonded Field Employees.

Instructions:

1. Daily prepare Purchase summary Exhibit B and purolate to Allstate's offices in Alexandria, Virginia.

2. Daily prepare sales summary Exhibit C, and purolate to Allstate's office in Alexandria, Virginia.

_____

## EXHIBIT D

⬛⬛⬛⬛⬛ REP⬛RT BY BETTY SNOOP OF ALLS⬛ ⬛ FI⬛⬛.CORP
RE:SALES 3LECKLEY LUMBER CO D/B/A ⬛CKLEY CTN.

DATE 01/19/84.......
REPORT NO 02.......

| L# | MILL-CONTRACT | BALES. | WAREHOUSE | LOCATION | ..COST.. | LAND | .AMOUNT. | NOTES |
|----|---------------|--------|-----------|----------|----------|------|----------|-------|
| 01 | DUNDEE7040/15 | 30.... | OMEGA.... | OMEGA... | .9072.82 | .... | 10812.78 | ..... |
| 02 | DUNDEE7050/17 | 32.... | BCT...... | MEIGS... | 12258.41 | .... | 15813.35 | ..... |
| 03 | ............. | .6.... | OMEGA.... | OMEGA... | .2178.04 | .... | ........ | ..... |
| 04 | DUNDEE8020/14 | 84.... | BCT...... | MEIGS... | 30709.48 | .... | 33810.74 | ..... |
| 05 | DUNDEE8020/13 | 76.... | CBW...... | COCHRAN. | 25808.19 | .... | 27369.93 | ..... |

TOTAL LOADS 4........
CERTIFICATION: I BETTY SNOOP HEREBY CERTIFY AND REPRESENT THAT ON THE ABOVE
DATE I WAS PERSONALLY TOLD BY THE RECOGNIZED AUTHORITIES (AND HAVE NO REASON
TO DISBELIEVE) THAT THE LOADS OF COTTON LISTED HEREIN WERE PRESENT IN THE
LOCATIONS AND QUANTITIES AS ABOVE INDICATED. I FURTHER RECOGNIZE THAT THE
ACCURACY OF THIS INFORMATION WILL BE RELIED UPON BY ALLSTATE FINANCIAL CORP
FOR DISBURSEMENT OF FUNDS.

..................................
SIGNATURE

8002694 878⬛6⬛⬛

7779.86 8.9⬛

EXHIBIT ·E

SALES REPORT BY BETTY SNOOP OF ALLSTATE FINAN.CORP
RE:SALES OF BLECKLEY LUMBER CO D/B/A BLECKLEY CTH.

DATE 01/17/84.......
REPORT NO 01.......

| L# | MILL-CONTRACT | BALES. | WAREHOUSE | LOCATION | ..COST.. | LAND | .AMOUNT. | NOTES |
|----|---------------|--------|-----------|----------|----------|------|----------|-------|
| 01 | MID-ATL8050/1 | 70.... | CBW...... | COCHRAN. | 22589.75 | 1/17 | 23179.88 | ..... |
| 02 | DUNDEE7040/12 | 79.... | MCCAY.16. | CORDELE. | .5332,76 | .... | 28828.72 | ..... |
| 03 | ............. | ...... | PITTS.34. | PITTS... | 18016.28 | .... | ........ | ..... |
| 04 | ............. | ...... | FARMERS29 | DAWSON.. | ,8298.43 | .... | ........ | ..... |
| 05 | GRANT-8040/1. | 88.... | WARDS.... | ARL/TON. | 29949.84 | .... | 31255.56 | ..... |
| 06 | DUNDEE7040/10 | 8..... | COOGLE... | OGLE/OPE | .2237.13 | .... | .2544.97 | ..... |
| 07 | DUNDEE7050/14 | 65.... | COOGLE... | OGLE/OPE | 19360.25 | .... | 22092.77 | ..... |
| 08 | DUNDEE8020/12 | 71.... | CBW...... | COCHRAN. | 23929.28 | .... | 26386.50 | ..... |
| 09 | DUNDEE7050/10 | 75.... | CBW...... | COCHRAN. | 27595.08 | .... | 30002.17 | ..... |
| 10 | DUNDEE7050/11 | 75.... | CBW...... | COCHRAN. | 27932.36 | .... | 30362.22 | ..... |
| 11 | DUNDEE7850/12 | 75.... | CBW...... | COCHRAN. | 26645.80 | .... | 28988.82 | ..... |
| 12 | DUNDEE7050/13 | 76.... | CBW...... | COCHRAN. | 27289.76 | .... | 29683.58 | ..... |
| 13 | DUNDEE7040/14 | 76.... | CBW...... | COCHRAN. | 26826.89 | .... | 28739.08 | ..... |
| 14 | DUNDEE7050/16 | 77.... | CBW...... | COCHRAN. | 27851.23 | .... | 30733.88 | ..... |
| 15 | DUNDEE7040/11 | 45.... | CBW...... | COCHRAN. | 15815.51 | .... | 16914.82 | ..... |
| 16 | DUNDEE7050/15 | 32.... | CBW...... | COCHRAN. | 11844.56 | .... | 12822.36 | ..... |
| 17 | DUNDEE7040/9. | 75.... | CBW...... | COCHRAN. | 29079.36 | .... | 30064.40 | ..... |

TOTAL LOADS ..17....
CERTIFICATION: I BETTY SNOOP HEREBY CERTIFY AND REPRESENT THAT ON THE ABOVE
DATE I WAS PERSONALLY TOLD BY THE RECOGNIZED AUTHORITIES (AND HAVE NO REASON
TO DISBELIEVE) THAT THE LOADS OF COTTON LISTED HEREIN WERE PRESENT IN THE
LOCATIONS AND QUANTITIES AS ABOVE INDICATED. I FURTHER RECOGNIZE THAT THE
ACCURACY OF THIS INFORMATION WILL BE RELIED UPON BY ALLSTATE FINANCIAL CORP
FOR DISBURSEMENT OF FUNDS.

.................. SIGNATURE

3417/3.37 37179277

3009438 8 / 1

EXHIBIT E—Continued

BILLING COPY

PUROLATOR ACCOUNT TO BE BILLED

DATE 1/19/84

FROM COMPANY NAME (CONSIGNOR)
ALLSTATE FINANCIAL CORPORATION

STREET ADDRESS
4660 Kenmore Avenue, Suite 701

CITY
Alexandria

STATE
VA

ZIP CODE (REQUIRED)
22304

P.O. OR REFERENCE NO.

SHIPPER'S SIGNATURE (PRINT AND SIGN)
X

TO COMPANY NAME (RECIPIENT)
Graniteville Mills

ATTENTION - INDIVIDUAL/DEPT /SUITE
Accounts Payable

PHONE NO.
404-736-1427

SATURDAY DELIVERY SERVICE REQUESTED

STREET ADDRESS
1549 Government Road

CITY
Augusta

STATE
GA

ZIP CODE (REQUIRED)
30904

48016305

TYPE OF SERVICE (CHECK ONE BOX ONLY)
PUROLATOR SPECIAL PRODUCTS

PURO LETTER
PUROPAK ENVELOPE
PUROPAK BOX OR TUBE
CUSTOMER CONTAINERS
AIR
GROUND
LTL

PAYMENT
PREPAID
COLLECT
BILL RECIPIENT
THIRD PARTY

THIRD PARTY NAME

ADDRESS

DESCRIPTION OF CONTENTS
Paper

DECLARED VALUE

PIECES

WEIGHT

DIMENSIONS
L W H

Purolator courier

UNIFORM BILL OF LADING
NL 1 Rev 7-83

WAITING TIME

INV NUMBER

FREIGHT

CODE AMOUNT

COURIER'S SIGNATURE
X

08590746 00000000 00000 1

EXHIBIT F

SUMMARY OF ALLSTATE
FINANCIAL CORPORATION'S LOSS

| ALLSTATE'S SCHEDULE NUMBERS | AMOUNT ADVANCED TO BLECKLEY | DATE OF ADVANCE | AMOUNT COLLECTED BY ALLSTATE | ALLSTATE'S LOSS |
|---|---|---|---|---|
| 2648 | 119,786.08 | 03/08/84 | 78,848.30 | 40,937.78 |
| 2654 | 68,767.45 | 03/09/84 | 0 | 68,767.45 |
| 2659 | 147,350.75 | 03/12/84 | 122,416.84 | 24,933.91 |
| 2667 | 71,778.33 | 03/13/84 | 23,962.74 | 47,815.59 |
| 2681 | 71,414.03 | 03/16/84 | 51,978.72 | 19,435.31 |
| 2690 | 95,845.28 | 03/19/84 | 52,327.63 | 43,517.65 |
| 2705 | 95,454.98 | 03/21/84 | 24,629.49 | 70,825.49 |
| 2709 | 126,538.96 | 03/22/84 | 99,508.70 | 27,030.26 |
| 2734 | 179,232.54 | 03/27/84 | 57,707.26 | 121,525.28 |
| 2748 | 75,002.73 | 03/30/84 | 52,755.56 | 22,247.17 |
| 2756 | 23,370.99 | 04/02/84 | 0 | 23,370.99 |
| 2764 | 134,602.99 | 04/03/84 | 0 | 134,602.99 |
| 2777 | 78,904.66 | 04/05/84 | 0 | 78,904.66 |
| 2785 | 77,827.18 | 04/06/84 | 24,660.64 | 53,166.54 |
| 2789 | 73,413.58 | 04/09/84 | 0 | 73,413.58 |
| 2801 | 83,782.70 | 04/10/84 | 33,797.96 | 49,984.74 |
| 2802 | 47,269.49 | 04/11/84 | 0 | 47,269.49 |
| 2808 | 64,245.47 | 04/12/84 | 0 | 64,245.47 |
| 2815 | 152,002.34 | 04/13/84 | 0 | 152,002.34 |

TOTAL LOSS 1,163,996.69

Recovery on rejected cotton (110,394.94)

Recovery on holdback reserve (134,535.65)

ALLSTATE'S NET LOSS $ 919,066.10

EXHIBIT G

 Walter E. Hell & Company
Southeast

EXHIBIT
Dixie
3
GMT 8/4/5L

HELLER
Business Loans

## Memorandum

DATE: April 23, 1984

TO: Barry Distel ML_____ JW_____ JR_____ GL_____ MA_____ MT_____

FROM: Michael Turtletaub

SUBJECT: ALLSTATE FINANCIAL

On the morning of April 20, 1984, Gene Haskins called Jimmy Spector to notify him that Larry Winkler has found some irregularities in the billing at Bleckley. He doesn't know the extent of it yet, but he has found 11 invoices totalling approximately $300M, which are probably fraudulent. He will continue his audit and probably by Monday, April 23rd will know the full extent of the fraud.

Gene informed us that Allstate had put on their payroll a girl that worked at Bleckley and had her bonded for $750M. This girl did the verifications of the Bleckley invoices assigned to Allstate.

WEH did find problems in verifying some of the invoices assigned to them by Allstate on Bleckley; going back to latter part of March and beginning of April. The problems that they found are as follows:

In verifying som eof the account debtors, the account debtor was not able to verify certain loads of cotton that they stated that they had not received. Mr. Winkler of Allstate was informed of this, and he stated that at times, when a shipment went out to, for example, 'A' company and the cotton was not up to standard for that company, it was in turn shipped on to 'B' company. 'B' company would pay for this shipment directly to Allstate. There was no credit issued to 'A' company by Bleckley or new billing to 'B' company. Therefore, when we called to verify 'A', they knew nothing about the shipment.

I did not care for that answer from Larry Winkler, and discussed this further with Barry when he was down in our office. At that point, Barry recognized the name Carlton Lawson, and he in turn called Gene Haskins and discussed Mr. Lawson with him.

In reviewing the copies of the checks which WEH receives from Allstate (this is a depository account), there are some checks that Allstate receives directly from Bleckley instead of customers that Bleckley sells to. When Glenn Lupa questioned Larry Winkler about these checks, he informed Glenn that Allstate had asked Bleckley to reimburse by check, any credits that were issued by Bleckley to their customers for returns of merchandise or shortages, etc. These, so to speak, shortages could be another way of covering up fraudulent billing sold to Allstate, or diversion of checks received by Bleckley.

April 23, 1984

Barry Distel

*Checks received directly from Bleckley are as follows:*

| | |
|---|---|
| 3/2/84 | $ 2,971.95 |
| 3/14/84 | 3,986.82 |
| 3/20/84 | 66,938.30 |
| 3/20/84 | 7,012.73 |
| 3/30/84 | 32,009.86 |
| 4/5/84 | 20,129.71 |
| 4/9/84 | 26,715.00 |
| 4/16/84 | 60,366.06 |

Status of account as of 4/20/84

| | Ineligible with Bleckley | Ineligible without Bleckley |
|---|---|---|
| Total A/R | $ 2,856,500 | $ 2,856,500 |
| Ineligible ($1,427,000 represents Bleckley as of 4/20/84) | 1,550,000 | 123,000 |
| Acceptable Coll | 1,306,500 | 2,733,500 |
| 65% Advance | 849,225 | 1,776,775 |
| Loan Balance | 1,128,716 | 1,128,716 |
| Availability | $( 279,500) O/A | $ 648,000 |

Participation: - *Capital Bank - 50% - $500,000 - Balance $327,600.

* WEH has 1st $500,000. Bob Kurau to notify bank.

Respectfully submitted,

Michael Turtletaub
agc

EXHIBIT H

Walter E. Heller : Company
Southeast

HELLER
Business Loans

## Memorandum

DATE: April 26, 1984

TO: Maynard Wishner

FROM: Barry Distel

SUBJECT: ALLSTATE FINANCIAL CORP. - MIAMI ACCOUNT

Recently we discovered that our client Allstate had been defrauded by
an account debtor of theirs by the name of Bleckley Cotton Co.
a d/b/a for Bleckley Lumber Co, Inc. of Cochran, GA, whose principal
is Mr. Carlton Lawson. Mr. Lawson was in affect a cotton broker, really,
and was buying and selling cotton to some fairly well rated accounts.
Since approximately March 6th through April 13th he had generated
account aggregating approximately $1,500,000 of which about $1,300,000
are uncollectible by virtue of non-delivery for the most part. This
fraud was perpetrated by Mr. Lawson in collusion with a bonded agent
of Allstates', a Mrs. Snoop. Mrs. Snoop would be responsible for the
handling of the billings, the confirmation of the fact that the goods were
being delivered and the fact that the sellers of the cotton were being
paid. Allstate, for the most part, relied upon her confirmation, although
they did do some back-office verification.

Our own verification system picked up questionable receivables during the
first week of April and were in part resolving the discrepancies but getting
put off by the administrative people in Allstate. During my review down
here in Miami the week of April 9th, the verification discrepancies were
brought to my attention and I recognized Mr. Lawson's name as having been
involved in a medium 7 figure fraud about 6 years ago, in which Iselin lost
approximately $5,500,000 and SLT was responsible to the National Bank of
Georgia for approximately $1,500,000. Subsequently called Gene Haskins,
a principal of our client and a guarantor on about April 11th to advise him
of the background of the individual. He was in touch with the man, and
visited during the week of the 16th. On Friday, the 20th with a conference
called between myself, Jimmy Spector and Lee Fishman, the other principal,
it was determined that a significant fraud was perpertrated.

Subsequently, our auditor Jeff Weiss went to Cochran, GA to be with our
clients' auditor, Larry Winkler to review the scope of the fraud. We then
met with attorney Mike Haber and John Latham, of the Smith Cohen lawfirm
in Atlanta, on April 24th to devise a strategy. These attorneys, whom we
are well acquainted with, will be acting as attorneys for Allstate in the
handling of this case.

Overall, our present position is that we have a loan balance of approximately
$1,121,000 and we are approximately $414,000 overadvanced. I have told
Mr. Fishman that I want him to come up with some hard collateral and he is
to come back to me by Monday. In the meantime, to maintain continuity, we
are advancing at a 65% advance rate on the receivables other then Bleckley
who, for all practical purposes is out of business. I have told him we will

EXHIBIT H—Continued

April 26, 1984

ALLSTATE FINANCIAL CORP. . . '. continued

review the credit during the next 30 days but in the meantime, if he feels uncomfortable with the new management he may find other financing for Puerto Rican operation.as well as this one.

Our relationship with these people goes back approximately 8 years and we have successfully worked out previous overadvances created by their account debtors. The personal financial statements of Leon and Barbara Fishman at September 30, 1982 indicate a net worth of approximately $2,200,000 of which about $1,200,000 is invested in real estates at varying interests. The financial statements of Eugene and Frances Haskin as of September 30, 1982 indicates a net worth of $5,900,000 with approximately $4,000,000 invested in real estate.

In summary, so long as they put up some additional collateral, I recommend that we go along with a short range program.

As a matter of information of the approximate $2,800,000 in collateral outstanding, as of March 31st, there are approximately $1,000,000 in face value of receivables other than Bleckley Cotton Co. Of this $1,000,000 the top five debtors are as follows:

| | | |
|---|---|---|
| Freight Traffic Management | $ 151,000 | – all current |
| Glen Crown & Bridge | 75,000 | – $10M over 45 days |
| Heritage Arts | 71,000 | – $ 8M over 45 days |
| Irene Lumber | 61,000 | – current |
| Bowmar Industries | 60,000 | – $20M over 45 days |
| Jo-Na Corp. | 59,000 | – $15M over 45 days |
| | $ 477,000 | |

Please see Mike Turtletaub's memo of April 23rd attached for specific details.

Status - 4/25/84

| | |
|---|---|
| A/R Face | $ 2,912M |
| Loan | 1,139 |
| O/A | 411M |

agc/enc

cc: Richard L. Philson
Alan Wright